John D. MARKS, Appellant,

v.

CENTRAL INTELLIGENCE AGENCY et al.

No. 77–1225.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1978.

Decided Aug. 24, 1978.

As Amended Aug. 25, and Nov. 15, 1978.

Mark H. Lynch, Washington, D. C., for appellant.

John F. Cordes, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Barbara Allen Babcock,

Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before WRIGHT, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

Opinion for the Court filed by LEVEN-THAL, Circuit Judge.

Opinion of J. SKELLY WRIGHT, Chief Judge, concurring in part and dissenting in part.

LEVENTHAL, Circuit Judge:

This appeal challenges the district court's judgment dismissing an action under the Freedom of Information Act (FOIA) challenging the withholding of certain documents requested from the Central Intelligence Agency (CIA). *Marks v. CIA,* 426 F.Supp. 708 (D.D.C.1976). Plaintiff, John D. Marks, was employed by the Department of State between 1966 and 1970, at which time he received a top-secret State Department security clearance and a top-secret liaison clearance from the CIA. The CIA also granted Marks "certain special compartmented security clearances which are utilized for information which is so sensitive that Top Secret classification is insufficient for its protection."[1] When Marks resigned from the State Department, he pledged in writing not to reveal classified information. The CIA's Office of Security undertook a national security intelligence investigation of Marks in 1973 "when it learned that he planned to publish a substantial quantity of classified information and when it was reported by sources that he was contacting present and former government employees in sensitive positions in an attempt to secure specific classified information from them."[2]

Plaintiff sought from the CIA "all files, dossiers, communications, computer print-outs and other documents" that the CIA then, or in the past, maintained concerning him. Some 41 documents were identified as responsive to plaintiff's FOIA request, but by the time of judgment the dispute focused on 14 documents.[3] Defendants claimed that nine documents were exempt under Exemptions 1 and 3 of the FOIA, and that five documents were exempt under Exemptions 3 and 7.[4] The district court denied plaintiff's motion for *in camera* inspection, and granted a summary judgment upholding all the government's claims. *Marks v. CIA,* 426 F.Supp. 708 (D.D.C.1976).

## I.

"On this appeal, plaintiff only challenges the district court's decision with respect to documents withheld under exemption 7."

1. Affidavit of Robert W. Gambino in support of defendant's (CIA's) motion for summary judgment.

2. *Marks v. CIA,* 426 F.Supp. 708, 709 (D.D.C. 1976).

3. At the administrative level, the CIA released 12 documents in their entirety; 22 with deletions. Six documents were withheld entirely. Certain documents were referred to the State Department for further consideration.

4. For the test of Exemptions 3 and 7, see 5 U.S.C. § 552(b), which provides in pertinent part:

This section does not apply to matters that are—

*   *   *   *   *   *

(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

*   *   *   *   *   *

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;

*   *   *   *   *   *

Appellant's Brief p. 5. Those five documents were also withheld under Exemption 3. Plaintiff-appellant abandons the contention made in the district court that Exemption 3 is wholly inapplicable as a matter of law. He submits only that a remand is necessary to determine whether there are segregable portions that do not fall within Exemption 3. *Id.*

While the case was pending on appeal the CIA released Document 10.[5] The material portion of the CIA affidavit describing the remaining four documents and its basis for withholding appear in the footnote.[6]

5. Appellant's reply brief filed September 30, 1977 stated (p. 11) that remand was appropriate in view of recent Justice Department policy directives. Attached was a letter of May 5, 1977 from the Attorney General to heads of Federal departments and agencies that stated, inter alia,

The government should not withhold documents unless it is important to the public interest to do so, even if there is some arguable legal basis for the withholding. In order to implement this view, the Justice Department will defend Freedom of Information Act suits only when disclosure is demonstrably harmful, even if the documents technically fall within the exemptions in the Act.

\* \* \* \* \* \*

In addition to setting these guidelines, I have requested Barbara Allen Babcock, Assistant Attorney General for the Civil Division, to conduct a review of all pending Freedom of Information Act litigation being handled by the Division. One result of that review may be to determine that litigation against your agency should no longer be continued and that information previously withheld should be released.

Assistant Attorney General Babcock, citing this directive, obtained leave to file with the court a CIA letter of January 5, 1978, which stated that Document 10 is the only document at issue involving intelligence methods, as contrasted with intelligence sources, and "continued protection is not required. The information previously denied was operationally concerned with another individual and the appearance of plaintiff was occasioned only by his close association with this person."

6. The affidavit submitted to the district court, executed April 23, 1976, by Robert W. Gambino, CIA's director of security, sets forth:

| Document | Description and Statement |
|---|---|
| 6 | Memorandum for Director of Security which transmits a report from a confidential source, who is specifically identified both by name and context, concerning plaintiff and his plan to reveal the identities of foreign, covert CIA employees and to provide this information to a group identified as the Fifth Estate. |
| | This document was denied in its entirety. It consists of information which specifically reveals the identity of a confidential source and discloses the method by which the confidential source gathered such information and transmitted such to the CIA. The information is of such a nature that disclosure of any part would immediately implicate the source. Names and organizational components of CIA employees are also contained therein. |
| 7 | Office of Security memorandum which concerns a report by a former employee on plaintiff's efforts to recruit him and secure classified information from him. |
| | This document was denied in its entirety. Since the information involved is directly concerned with plaintiff's specific discussions with a former employee of the CIA, disclosure would enable plaintiff to identify the person, thus compromising the confidential intelligence source. The report also contains substantive information from the former employee's personnel, medical, and other files which was included in order to evaluate the reliability of the information provided. |
| 14 | Office of Security memorandum in which a confidential source, who is identified, reports that plaintiff has provided substantial classified information, including the names and addresses of CIA employees assigned to foreign countries, to the publication *Counterspy*, who will reveal this information at an upcoming press conference. |
| | This document was denied in its entirety. It consists solely of information derived from a confidential intelligence source. The substance of the information is so specific that its disclosure would permit the plaintiff to ascertain with near certainty the identity of the source. Further, the source also provides information about another prominent citizen and his active monetary support of the publication *Counterspy*. This fact is not gen- |

It is apparent on inspection that a substantial claim has been made that disclosure would reveal the identity of confidential sources of information. The district court ruled that under Exemption 3, which applies to matters "specifically exempted from disclosure · by statute," section 102(d)(3) of the National Security Act of 1947,[7] is a qualifying statute. It supported that ruling with authority. That ruling is not contested.

Plaintiff claims that the district court's Exemption 3 ruling may not suffice to support withholding of the entire document(s). This presents the segregability issue, which was not addressed by the district court. Apparently the district court was concentrating on the broader contention that it considered to be the plaintiff's primary argument.

We remand to the district court to determine whether the four documents involved are entirely exempt under Exemption 3, in which event there is no need to determine any other legal issue, or whether there are fairly segregable portions, in which event other issues may remain if the government continues to resist disclosure.

In conducting the remand proceeding the district court will proceed in accordance with the principles of de novo review outlined in *Ray v. Turner*, 190 U.S.App.D.C. ——, 587 F.2d 1187 (1978), decided this day.

## II.

■ In view of the possibility that there will be no need to consider the legal issues under Exemption 7, we do not address them. One could say with equal logic: (1) explore Exemption 3, in which case it may not be necessary to consider Exemption 7; or (2) explore Exemption 7, in which case it may not be necessary to consider Exemption 3.

The matter calls for judgment in judicial administration. The court is of the view that the legal issues involved in Exemption 7 are of some delicacy and perhaps difficulty. The sound administration of justice is enhanced by addressing those issues only in the context of a record where they must be faced and hence fuller perspective is likely.

What plaintiff Marks craves is a broad ruling that the CIA's national security investigation of him was in violation of law.

| Document | Description and Statement |
|---|---|
|  | erally known and its revelation might seriously embarrass such person and would undoubtedly be a serious invasion of his personal privacy. |
| 29 | Memorandum written by the Assistant to the Director and addressed to the General Counsel. In this memorandum a meeting with a senior public media official is recounted in which the General Counsel was advised of certain writings which Mr. Marks intended to submit for publication to a magazine. |
|  | This document was denied in its entirety. It identifies the confidential intelligence source by name and position. Further, the information contained therein, which consists of the subject matter of the discussion, would if released reveal the identity of the source by direct implication. |

7. 50 U.S.C. § 403(d)(3) provides in pertinent part:

> (d) **Powers and duties.**
>
> For the purpose of coordinating the intelligence activities of the several Government departments and agencies in the interest of national security, it shall be the duty of the Agency, under the direction of the National Security Council—
>
>     *     *     *     *     *     *
>
> (3) to correlate and evaluate intelligence relating to the national security, and provide for the appropriate dissemination of such intelligence within the Government using where appropriate existing agencies and facilities: *Provided,* That the Agency shall have no police, subpena, law-enforcement powers, or internal-security functions: *Provided further,* That the departments and other agencies of the Government shall continue to collect, evaluate, correlate, and disseminate departmental intelligence: *And Provided Further,* That the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure; . . . .

The issue turns on the scope of the provision of the National Security Act of 1947 that provides: "the Agency shall have no police, subpena, law-enforcement powers, or internal-security functions." 50 U.S.C. § 403(d)(3). In *Weissman v. CIA,* 184 U.S. App.D.C. 117, 565 F.2d 692 (1977), the court ruled that Exemption 7 did not protect the records generated by an investigation conducted by the CIA to determine whether plaintiff "was a safe candidate for recruitment by the Agency." 184 U.S.App.D.C. at 120, 565 F.2d at 695. The court reviewed the legislative history, Congress's realistic fear of a secret police, and its desire to protect America's security without "making the mistake of creating an American 'Gestapo.'" *Id.* The court concluded that § 403(d)(3) "was intended, at the very least, to prohibit the CIA from conducting secret investigations of United States citizens, in this country, who have no connection with the Agency." *Id.* The court further stated:

> Whatever may be the power to check on its own personnel, we are obliged to agree with the Church Committee when it commented on § 403(d)(3):
>
> > Given the prohibition against internal security functions, it is unlikely that the provision was meant to include investigations of private American nationals who had no contact with the CIA, on the grounds that eventually their activities might threaten the Agency.
>
> 184 U.S.App.D.C. at 121, 565 F.2d at 696.

*Weissman* recognized that a distinct issue would be presented in the case of a person who did have a "connection" or "contact" with the CIA. While the language of the 1947 Act excludes from the CIA's mandate "law enforcement powers, or internal-security functions," *Weissman* does not resolve the issue whether Congress intended to foreclose all CIA authority to investigate its current employees, and beyond that, former employees or persons such as State Department employees with top-secret liaison clearance giving them access to the inner recesses and confidential files of the CIA.

We are of course aware of the 1976 report of the Church Committee[8] to which the *Weissman* opinion referred. In general, that Committee considered its approach to the problem of Central Intelligence Agency activities to be "similar to Executive Order 11905"[9] but with some further restrictions on CIA activity.[10] The restrictions are reflected in its Recommendation 8, which provides that the CIA should not collect information within the United States concerning Americans, subject to exceptions such as information concerning CIA employees, contractors, applicants for employment or contracting; individuals or organizations providing, or offering, or being considered by CIA as potential sources of, assistance to the CIA.[11]

---

**8.** Intelligence Activities and the Rights of Americans, [Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities], Book II, p. 299, S.Rep.No.94–755, 94th Cong., 2d Sess. (1976).

**9.** *Id.* at 298. E.O. 11905 appears at 3 C.F.R. 90–103 (1977).

**10.** S.Rep.No.94–755, *supra* note 8, at 297–98:
The CIA is responsible for foreign intelligence and counterintelligence. These recommendations minimize the impact of CIA operations on Americans. They do not affect CIA investigations of foreigners outside of the United States. The main thrust is to prohibit past actions revealed as excessive, and to transfer to the FBI other activities which might involve the CIA in internal security or law enforcement matters. Those limited activities which the CIA retains are placed under tighter controls.
The Committee's recommendations on CIA domestic activities are similar to Executive Order 11905. They go beyond the Executive Order, however, in that they recommend that the main safeguards be made law. And, in addition, the Committee proposed tighter standards to preclude repetition of some past abuses.

**11.** *Id.* at 303. There are also exceptions for visitors to CIA facilities; others in the immediate vicinity of sensitive CIA facilities; and those giving consent.

Of some interest is the Report's Recommendation 7 to limit physical surveillance and confidential inquiries to specified situations. The Report explains:

The Committee would permit the CIA to conduct physical surveillance of persons on the premises of its own installations and facilities. Outside of its premises, the Committee would permit the CIA to conduct limited physical surveillance and confidential inquiries of its own employees as part of a preliminary security investigation.

Although the Committee generally centralizes such investigations within the FBI, it would be too burdensome to require the Bureau to investigate every allegation that an employee has personal difficulties, which could make him a security risk, or allegations of suspicious behavior suggesting the disclosure of information. Before involving the FBI, the CIA could conduct a preliminary inquiry, which usually consists of nothing more than interviews with the subject's office colleagues, or his family, neighbors or associates, and perhaps confrontation of the subject himself. In some situations, however, limited physical surveillance might enable the CIA to resolve the allegation or to determine that there was a serious security breach involved.

Unlike the Executive Order, however, the Committee recommendations limit this authority to present CIA employees who are subject to summary dismissal. The only remedy available to the Government for security problems with past employees is criminal prosecution or other legal action. All security leak investigations for proposed criminal prosecution should be centralized in the FBI. Authorizing the use of any covert technique against contractors and their employees, let alone former employees of CIA contractors, as the Executive Order does, would authorize CIA surveillance of too large a number of Americans. The CIA can withdraw security clearances until satisfied by the contractor that a security

risk has been remedied and, in serious cases, any investigations could be handled by the FBI.

S.Rep. No. 94–755, *supra* note 8, at 299–300.

An overriding question is the extent to which the Church Committee Report proposes a change in existing law or a clarification of existing law. Its views would not be controlling on a court, nor does it speak to the issue directly. It proposed a restriction on the CIA by "transfer to the FBI" of "activities which might involve the CIA in internal security or law enforcement matters." [12]

If the prohibition in the 1947 Act against CIA exercise of "police, subpena, law-enforcement powers, or internal-security functions" is an absolute and broad imperative, it would prohibit the limited kind of physical surveillance and confidential inquiry that the Committee regards as appropriate, *e. g.*, with respect to preliminary security investigations of employees of the CIA or of contractors having comparable access. Presumably such investigations were regarded not as violations of the 1947 law, but as permitted by implications of reasonable exceptions.

This problem is studiously ignored by the dissent, which builds on an assumption that the statute and *Weissman* unmistakably prescribe an unqualified ban on any "law enforcement" activity, without vouchsafing an explanation of any possible basis for Weissman's reservation concerning the CIA's "power to check on its own personnel." 184 U.S.App.D.C. at 121, 565 F.2d at 696 (footnote 8 and accompanying text).

If the prohibition of CIA confidential inquiry concerning past employees is based on the premise that all security leak investigations for proposed criminal prosecution should be centralized in the FBI, the question arises as to investigation not for criminal prosecution but to avoid compromise of the CIA's claim of right to review material prior to publication. Compare *United States v. Marchetti*, 466 F.2d 1309 (4th Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34

12. *Supra* note 10.

L.Ed.2d 516 (1972). More important is the problem of investigation of possible contact between former and present CIA employees (or other government employees given CIA top-secret liaison status) for the purpose of forestalling future breaches by those still having access to confidential information.

■ On January 24, 1978, President Carter issued Executive Order 12036, as a clarifying order building on the experience under President Ford's E.O. 11905. As to the issue of former employees, it apparently widens the role assigned by the President to the CIA.[13] Of course, an executive order cannot supersede a statute. What does emerge, however is that the interpretation of the 1947 law is a legal issue that relates to an area of tension.

It may be that in any case where the CIA might have a claim under Exemption 7(D), it can handle the situation satisfactorily by a claim under Exemption 3 that the production of investigatory records would "disclose the identity of a confidential source."[14]

We have noted Attorney General Bell's policy of defending FOIA suits "only when disclosure is demonstrably harmful," even when exemptions are technically available. See footnote 5 supra.

■ Some tension is inevitable when a court must decide the extent of CIA authority collaterally, in the context of an FOIA action. We think it appropriate to reserve that function for cases where the FOIA requires it. In a particular case where any material confidential under Exemption 3 has been segregated out and the Department of Justice defends the withholding on the ground that the disclosure is "demonstrably harmful," the court will have a spe-

cific context and a concrete record, probably one sealed in part, likely to be helpful in its exploration of the disputed issue of CIA authority.

If the issue were such as to admit of no possible need for further and careful exploration there would be room for uttering decision forthwith, taking into account that the FOIA is one of the dozens of statutes that prescribe expedition. However, it is our view that the issue requires more probing and insight. If the district court concludes on remand that Exemption 3 does not provide a complete exemption, it should attend to a more searching examination of Exemption 7 issues, including (1) an inquiry into the nature of access to CIA confidences that is available to a State Department employee with top-secret liaison and compartmented security clearances, (2) the basis of CIA authority to conduct investigations involving either (a) suspected violations of agreements not to reveal classified information or (b) persons making contact with current CIA employees, with or without the use of former CIA credentials.

The case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

J. SKELLY WRIGHT, Chief Judge, concurring in part and dissenting in part:[1]

In this Freedom of Information Act (FOIA) suit appellant John D. Marks, a former State Department employee, seeks from the Central Intelligence Agency (CIA) certain documents containing information about himself. In response to Marks' original FOIA request the Agency released some material concerning him, but withheld certain portions of its files on Marks claiming

13. See §§ 1–604(a), 1–811 and 2–208(c), Weekly Comp. of Pres. Doc., vol. 14, no. 4, pp. 200, 201, 208 (Jan. 30, 1978).

14. Curiously, the syntax of Exemption 7 is such that it is only when the government seeks to withhold the "confidential information furnished only by the confidential source" that the text requires that the agency must have been "conducting a lawful national security intelligence investigation."

1. In view of our differences over the extent to which we should consider Exemption 7 of the FOIA, 5 U.S.C. § 552(b)(7) (1976), on this appeal, I have decided to state my position separately and in full. For a discussion of why Exemption 7 requires full treatment now, see note 5 infra.

Exemptions 1, 3, or 7, depending on the document.[2] The District Court sustained the Agency's action on the basis of the exemptions claimed.[3] Marks appeals from the District Court's conclusions as to five documents withheld pursuant to Exemptions 3 and 7. The Agency has recently released one of these documents.[4]

Unlike Judge Leventhal, I would hold now, as this court did in *Weissman v. CIA*, 184 U.S.App.D.C. 117, 119–121, 565 F.2d 692, 694–696 (1977), a case indistinguishable from this case, that Exemption 7 is inapplicable to the remaining four documents because they were not "compiled for law enforcement purposes" in a "lawful national security intelligence investigation," 5 U.S.C. § 552(b)(7)(D) (1976), in that they were compiled in an unlawful domestic intelligence investigation by the CIA of a United States citizen. 50 U.S.C. § 403(d)(3) (1970).[5]

2. Affidavit of Robert S. Young, Freedom of Information Coordinator, CIA, April 23, 1976, Joint Appendix (JA) 18–21.

3. *Marks v. CIA*, 426 F.Supp. 708 (D.D.C.1976).

4. The Agency has released a previously withheld portion of Document 10, which had been withheld under Exemption 7(E) because it would allegedly "disclose investigative techniques and procedures." 5 U.S.C. § 552(b)(7)(E) (1976). The Agency formerly described the portion now released as "information which is a product of the national security intelligence investigation and which if released or described in any manner would disclose the intelligence method and the investigative technique utilized * * *." Affidavit of Robert Gambino, Director of Security, CIA, April 23, 1976, JA 30. The now released portions of Document 10 contain *photographs* of appellant Marks and other individuals *on the street* outside a restaurant. At least on their face such photographs do not qualify as the kind of investigative techniques and procedures Congress intended to protect from disclosure. Congress expressly directed that Exemption 7(E) "should not be interpreted to include routine techniques and procedures already well known to the public * * *." H.R. Rep. No. 93–1380, 93d Cong., 2d Sess. 12 (1974). It is noted that the government has not only released this portion of Document 10, but has also declined to press its Exemption 7(E) claims with regard to the other four contested documents. *See* appellees' brief at 12 n.4.

The Agency's descriptions of the four documents in dispute may be found in note 9 *infra*.

5. In spite of the District Court's holding that the relevant documents are exempt under both Exemption 3 and Exemption 7, *Marks v. CIA*, supra note 3, 426 F.Supp. at 710–712, Judge Leventhal's opinion refuses to confront the legal issues raised by the CIA's reliance on Exemption 7 in this case. Since it is conceivable that the District Court on remand may find *all* of the relevant documents *entirely* covered by Exemption 3, he reasons in one portion of his opinion, there exists "the possibility that there will be no need to consider the legal issues under Exemption 7." Opinion of Leventhal, J., 191 U.S.App.D.C. at ——, 590 F.2d at 1000.

"The matter," he continues, "calls for judgment in judicial administration." *Id.* Yet in another portion of his opinion Judge Leventhal suggests that lack of ripeness for decision, not judicial economy, is at the core of his reluctance to decide the legal issues raised by Exemption 7. *Id.*, 191 U.S.App.D.C. at ——, 590 F.2d at 1003. Both reasons for ignoring the legal issues relating to Exemption 7 raised on this appeal are unpersuasive.

As to judicial economy, nearly three and one-half years have passed since appellant in this case first wrote the CIA in his attempt to ascertain what information the Agency had gathered on him. Affidavit of Robert S. Young, *supra* note 3, JA 18 (*quoting* letter sent by appellant to CIA on March 10, 1975). Almost three years have expired since appellant first filed this suit under the FOIA. *Marks v. CIA*, *supra* note 3, 426 F.Supp. at 709 (suit filed on October 20, 1975). And nearly two years have passed since the District Court's judgment in the autumn of 1976. Yet appellant is now confronted with a "judgment in judicial administration" that, notwithstanding his 40-month trek through the recesses of the Freedom of Information Act, consigns him not only to a second round in the District Court, but also to the possibility of a third round, in the event the District Court on remand finds that portions of the documents are segregable (not covered by Exemption 3) but then misapplies Exemption 7. Since the District Court has already found that not only Exemption 3 but Exemption 7 as well applies to the four documents under review, what acceptable judgment in judicial administration can support our avoiding decision with respect to Exemption 7 now, so that, if necessary, on *this* remand the District Court can decide as to both Exemptions 3 and 7 and thus avoid the possibility of unnecessary further remands?

Delay, such as that which the majority opinion may cause in this case, is particularly inappropriate in a FOIA suit, since Congress has mandated that such cases be expedited. *See* 5 U.S.C. § 552(a)(3) (1976) (requiring agencies to make records available "promptly"); *id.* § 552(a)(4)(D) (requiring District Courts to assign FOIA cases to be heard on the "earliest

I agree with Judge Leventhal that the District Court's consideration of the Agency's Exemption 3 claim was inadequate. I would remand this case for further proceedings under Exemption 3 consistent with this opinion.

## I. BACKGROUND

From 1966 to 1970 appellant Marks was employed by the State Department. During this time he was granted a top secret State Department security clearance and also a top secret liaison clearance from the CIA.[6] In 1970 Marks left the State Department and became Executive Assistant to Senator Clifford Case of New Jersey, a member of the Senate Foreign Relations Committee. While serving in this capacity Marks was instrumental in an investigation of the CIA's covert support of Radio Free Europe. In 1972 he took a leave of absence from Senator Case's office to work on a book about the CIA with Victor Marchetti, a former CIA employee. After the book was published in 1974 Marks joined the Center for National Security Studies in Washington, D.C., where he is still employed.

In 1973 the CIA became concerned about Marks' work with Marchetti on the book, and its "Office of Security undertook a national security intelligence investigation" of Marks.[7] In March 1975 Marks made a

FOIA request of the CIA for "any files, dossiers, computer printouts, or other documents it now has or has ever had on me as an individual citizen, Foreign Service Office, Senate aide, journalist, writer, or Associate of the Center for National Security Studies."[8] The Agency identified 41 such documents and released 12 in their entirety, but withheld six in their entirety and portions of 22 others. One document was referred to the State Department for disposition.

Marks, seeking the materials withheld by the CIA, brought this suit in District Court in October 1975. During the litigation his request was narrowed to 14 documents. The District Court refused to conduct an *in camera* inspection of the disputed materials and sustained the Agency's refusal to disclose the documents on the basis of Exemptions 1, 3, or 7. As mentioned above, this appeal focuses on four documents, which the Agency has withheld in reliance on Exemptions 3 and 7. Since the District Court in affirming the Agency's action dealt more extensively with Exemption 7, that Exemption will be examined first.

## II. EXEMPTION 7

The relevant portion of Exemption 7 applies to "investigatory records compiled for law enforcement purposes, but only to the

---

practicable date"; FOIA cases "take precedence on the docket over all cases" except those the court considers of greater importance). It is submitted that judgments in judicial administration must be subordinated to the will of Congress, which, in the words of the Supreme Court, is to provide aggrieved citizens "a speedy remedy in district courts." *EPA v. Mink*, 410 U.S. 73, 79, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). This court can comply with the clear mandate of Congress to expedite FOIA cases only by addressing both Exemption 3 and Exemption 7 now, since the District Court held that the four documents in suit were protected from production under both exemptions.

The majority also expresses concern about the ripeness of the Exemption 7 issues in this case. Exemption 7, with certain qualifications indicated therein, exempts from disclosure under FOIA documents "compiled for law enforcement purposes." 50 U.S.C. § 403(d)(3) provides, *inter alia*, that the CIA "shall have no

police, subpena, law-enforcement powers, or internal security functions." *See Weissman v. CIA*, 184 U.S.App.D.C. 117, 119–121, 565 F.2d 692, 694–696 (1977). Thus the question is whether the CIA had statutory authority to compile the documents in suit for law enforcement purposes. If it did not, obviously Exemption 7 does not apply to them. This, of course, is a legal question which, considering the extended character of this litigation, in my judgment is more than ripe, rather than unripe, for adjudication now.

6. Affidavit of John D. Marks, May 26, 1976, JA 41. The facts in this paragraph are drawn from this affidavit and are uncontested.

7. Affidavit of Robert W. Gambino, *supra* note 4, JA 23.

8. Affidavit of Robert S. Young, *supra* note 2, JA 18.

extent that the production of such records would * * * (D) disclose the identity of a confidential source and, in the case of a record compiled * * * by an agency conducting a lawful national security intelligence investigation, confidential information, furnished only by the confidential source * * * ." 5 U.S.C. § 552(b)(7)(D)

9. Affidavit of Robert S. Young, *supra* note 2, JA 20–21. The four disputed documents are described by the Agency as follows:

> 6 Memorandum for Director of Security which transmits a report from a confidential source, who is specifically identified both by name and context, concerning plaintiff and his plan to reveal the identities of foreign, covert CIA employees and to provide this information to a group identified as the Fifth Estate.
>
> This document was denied in its entirety. It consists of information which specifically reveals the identity of a confidential source and discloses the method by which the confidential source gathered such information and transmitted such to the CIA. The information is of such a nature that disclosure of any part would immediately *implicate the source.* Names and organizational components of CIA employees are also contained therein.

> 7 Office of Security memorandum which concerns a report by a former employee on plaintiff's efforts to recruit him and secure classified information from him.
>
> This document was denied in its entirety. Since the information involved is directly concerned with plaintiff's specific discussions with a former employee of the CIA, *disclosure would enable plaintiff* to identify the person, thus compromising the confidential intelligence source. The report also contains substantive information from the former employee's personnel, medical, and other files which was included in order to evaluate the reliability of the information provided.

> *        *        *

> 14 Office of Security memorandum in which a confidential source, who

(1976). The CIA contends that the four documents sought in this appeal are covered by this exemption because they were products of a lawful national security investigation and because releasing any portion of them would reveal the identity of confidential sources and information obtained solely from confidential sources.[9] Appellant ar-

> is identified, reports that plaintiff has provided substantial classified information, including the names and addresses of CIA employees assigned to foreign countries, to the publication *Counterspy,* who will reveal this information at an upcoming press conference.
>
> This document was denied in its entirety. It consists solely of information derived from a confidential intelligence source. The substance of the information is so specific that its disclosure would permit the plaintiff to ascertain with near certainty the identity of the source. Further, the source also provides information about another prominent citizen and his active monetary support of the publication *Counterspy.* This fact is not generally known and its revelation might seriously embarrass such person and would undoubtedly be a serious invasion of his personal privacy.

> *        *        *

> 29 Memorandum written by the Assistant to the Director and addressed to the General Counsel. In this memorandum a meeting with a senior public media official is recounted in which the General Counsel was advised of certain writings which Mr. Marks intended to submit for publication to a magazine.
>
> This document was denied in its entirety. It identifies the confidential intelligence source by name and position. Further, the information contained therein, which consists of the subject matter of the discussion, would if released reveal the identity of the source by direct implication.

Affidavit of Robert W. Gambino, *supra* note 4, JA 29–31. *See also* Supplementary Affidavit of Robert W. Gambino, July 7, 1976, JA 53–54. The Agency also relied on Exemption 7(E) for all four documents and on Exemption 7(C) for

gues that Exemption 7 does not apply to these documents because they were not compiled for law enforcement purposes in a *lawful* national security investigation. The District Court rejected appellant's position, holding that the CIA's investigation of Marks was a "lawful national security intelligence investigation" under Exemption 7(D).

The basic issue governing the application of Exemption 7 in this case is thus the scope of the CIA's legal authority to investigate persons in Marks' situation. This issue has two aspects: first, in accordance with the general prescription of Exemption 7, whether the documents were "compiled for law enforcement purposes"; and, second, in accordance with the language of subsection (D), whether the documents were compiled in a "lawful national security investigation." These two aspects of the issue in fact collapse into a single determination. That is to say, in order for the CIA to have fulfilled the requirement that the documents be "compiled for law enforcement purposes," the Agency must have been engaged in a "lawful national security investigation," for only in such an investigation would the documents in suit have been "compiled for law enforcement purposes." Hence our inquiry here must focus on the

lawfulness of the CIA's investigation of appellant.

Two months after the District Court's decision in this case this court considered the CIA's authority to conduct domestic investigations of American citizens in *Weissman v. CIA,* 184 U.S.App.D.C. 117, 119–121, 565 F.2d 692, 694–696 (1977), a FOIA case quite similar to the one now before us. The CIA had investigated the plaintiff in *Weissman* without his knowledge as a potential employee and had refused to disclose certain documents compiled in its investigation, relying in part on Exemption 7.[10] The question before this court in *Weissman,* as in this case, was whether the CIA's investigation was a "lawful national security intelligence investigation."

We held in *Weissman* that the CIA's investigation was not lawful and that the Agency could therefore not rely on Exemption 7 to refuse the plaintiff's FOIA request. Our conclusion was based on an analysis of the language and legislative history of the statute creating the CIA. We noted that the "National Security Act of 1947 * * * specifically provided that the 'Agency shall have no police, subpena, law-enforcement powers, or internal-security functions.' 50 U.S.C. § 403(d)(3)." 184 U.S.App.D.C. at 120, 565 F.2d at 695.[11] We, also recognized the reason behind this ex-

---

Documents 7 and 14. Affidavit of Robert W. Young, *supra* note 2, JA 20–21. The government does not argue these other exemptions on appeal, claiming that 7(D) is sufficient by itself. Appellees' brief at 12 n.4. (The government also, perhaps, recognized the weakness of its 7(E) claims, *see* note 4 *supra.*)

**10.** The CIA in *Weissman,* as in this case, also relied on Exemption 3. *See Weissman v. CIA, supra* note 5, 184 U.S.App.D.C. at 119, 565 F.2d at 694; text and notes at notes 19–21 *infra.*

**11.** The full text of 50 U.S.C. § 403(d)(3) (1970) reads:

> For the purpose of coordinating the intelligence activities of the several Government departments and agencies in the interest of national security, it shall be the duty of the Agency, under the direction of the National Security Council—
>
>     *     *     *     *     *     *
>
> (3) to correlate and evaluate intelligence relating to the national security, and provide

for the appropriate dissemination of such intelligence within the Government using where appropriate existing agencies and facilities: *Provided,* That the Agency shall have no police, subpena, law-enforcement powers, or internal-security functions: *Provided further,* That the departments and other agencies of the Government shall continue to collect, evaluate, correlate, and disseminate departmental intelligence: *And provided further,* That the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure[.]

Although the discussion in text focuses on the Agency's misplaced reliance on 7(D)—the only Exemption 7 claim relied on by the CIA— it is not clear that the Agency's activities fall within any of the six subcategories in Exemption 7. Exemption 7 is prefaced by a general prescription that the only materials within its scope are "investigative records compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7) (1976). As the statutory language quoted above makes clear, Congress denied the

press limitation on the CIA's authority: Congress' firm resolve to insure that the CIA's "power that flows from money and stealth" could not be turned loose in domestic investigations of Americans.[12] "Congress wisely sought at the outset to make sure that when it released the CIA genie from the lamp, the Agency would be prevented from using its enormous resources and broad delegation of power to place United States citizens living at home under surveillance and scrutiny." *Id.* We were not persuaded by the CIA's argument, also relied on by the Agency and by the District Court in this case, that when, in another provision of Section 403(d)(3), Congress made the Director of Central Intelligence "responsible for protecting intelligence sources and methods from unauthorized disclosure," it meant to *grant* the CIA the very same authority it had just specifically *denied* it.[13]

---

CIA any "law-enforcement powers," which would suggest that the CIA would not be able to avail itself of any of the Exemption's subcategories. Indeed, this court in *Weissman* appeared to reach this conclusion. 184 U.S.App. D.C. at 119–121, 565 F.2d at 694–696.

The majority opinion, Opinion of Leventhal, J., 191 U.S.App.D.C. at ——, 590 F.2d at 1002, suggests that much may be made of *Weissman's* refusal to reach the question of the CIA's power to investigate its own personnel and its presumed consequent ability to withhold files resulting from such investigations under Exemption 7. 184 U.S.App.D.C. at 121, 565 F.2d at 696. The majority apparently overlooks the eminently reasonable inference that the *Weissman* court only reserved judgment on that issue because it was not before the court. Weissman was not an employee of the CIA, although the Agency's investigation of him was undertaken, without Weissman's knowledge, with a view to the possibility of hiring him in the future. Even in that situation, seemingly as close a case as may arise to one involving the "personnel" to whom the *Weissman* court alluded, the court found the CIA's investigation unlawful and Exemption 7 unavailable to the Agency in its attempt to withhold its information from Weissman. Unlike in the *Weissman* case, there is no hint in the present case of the CIA's exercising some aspect of its employment function; rather, the Agency was conducting the very sort of domestic investigation of a United States citizen that Congress sought to preclude. *See* text and notes at notes 10–13 *supra* and *infra*.

12. The Agency has been given far-reaching authority to gather information and to conduct intelligence activities abroad. These vital functions are liberally financed and concern national security. * * * The Agency, of course, proceeds in secret. Many of its operations are covert, and since the stakes are high few are in a position to know or to question the manner by which it carries out its work. It has the power that flows from money and stealth. Congress was well aware such activities create a potential for abuse, and chose to limit the Agency's activities to intelligence gathering abroad. It was unwilling to make it a policeman at home, or to create a conflict between the CIA and the FBI.

184 U.S.App.D.C. at 120, 565 F.2d at 695.

13. *Id. See Foreign and Military Intelligence: Final Report of the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities,* S. Rep. No. 94–755, 94th Cong., 2d Sess., Bk. I, at 138–139 (1976):

* * * Despite congressional concern, expressed again and again during hearings and floor debates on the bill, that the CIA was to have no potential for infringing upon the rights of American citizens and that it was to be virtually excluded from acting within the United States, no one questioned whether the sources and methods language would raise problems in this area. The lack of interest in the provision suggests that it was not viewed as conveying new authority to investigate; rather it charged the Director of Central Intelligence Agency with responsibility to use the authority which he already had to protect sensitive intelligence information. This could mean implementing strict security procedures within CIA facilities and conducting background investigations of CIA personnel (although according to the former Agency General Counsel, the CIA first requested that the FBI perform this investigative function; J. Edgar Hoover refused to assume this responsibility on grounds of insufficient personnel within his own Bureau). * * *

(Footnote omitted.) Appellant also calls to our attention two directives from William Colby, who was Director of the CIA during the investigations relevant to this case, restricting the CIA's investigatory activities:

SUBJECT: [Cases Involving Investigation of Newsmen]

No surveillance, telephone tap, surreptitious entry or other action will be taken by Agency personnel in the United States against United States citizens not connected with CIA, under the claimed authority of

The CIA urges us to distinguish *Weissman* on its facts because the target of the CIA's investigation in *Weissman* had "no contact" with the Agency, while Marks, although not a CIA employee, did serve as a liaison between the CIA and the State Department and held a CIA security clearance. Indeed, Judge Leventhal's opinion, *see* Opinion of Leventhal, J., 191 U.S.App.D.C. at ——, 590 F.2d at 1001–1002, although professing not to address the legal issues under Exemption 7, alludes to this perceived distinction between the present case and *Weissman*. His opinion in fact travels an additional step by intimating not only that CIA "personnel" may be subject to lawful domestic CIA intelligence investigations—this possibility was left open in *Weissman, see Weissman v. CIA, supra,* 184 U.S.App. D.C. 121, 565 F.2d at 696—but also that "former employees [of the CIA] or persons such as a State Department employee with top-secret liaison clearance" may be as well. Opinion of Leventhal, J., 191 U.S.App.D.C. at ——, 590 F.2d at 1001.

Judge Leventhal's formulation is disturbingly open-ended; it seemingly invites CIA investigations of employees of other agencies, so long as they have a CIA clearance somewhere in their backgrounds, even if, as in the present case, the individual is or has been a key congressional aide. *See* text and note at note 17 *infra*. This is hardly in keeping with Congress' expressed determination to keep the CIA out of domestic investigations, a determination that requires the same result both in this case and in *Weissman. See* 50 U.S.C. § 403(d)(3) (1970); text and notes at notes 11–13 *supra*. Distinguishing between the investigation here and that in *Weissman* would create an uncertain line between legitimate and illegitimate national security investigations. Although Weissman to his own knowledge had "no contact" with the CIA, the Agency had conducted a continuing "background" investigation of him as a possible candidate for employment for five years, accumulating a volume of material at least as great as that generated in the Agency's investigation of Marks.[14] Such "background" investigations of prospective employees are among those the CIA has traditionally claimed it is authorized to conduct.[15]

On the other hand, to hold, as the CIA contends, that the Agency may investigate any person who has ever had "contact" with the Agency would expand the CIA's authority far beyond the limits intended by Congress.[16] At the time he was investigated

---

"protection of intelligence sources and methods." This provision of the law lays a charge and duty on the Director and the Agency to act so as to protect intelligence sources and methods. It does not give it authority to take action with respect to other American citizens. If a threat or exposure of intelligence sources and methods occurs, the Agency can appropriately assemble its information on the topic and conduct such steps within its organization as may be appropriate. With respect to outsiders, the appropriate lawful authorities must be approached for assistance on the matter, e. g., the FBI or local police. Memorandum from William Colby to Deputy Director for Administration, Attachment "Memorandum: [News Leak Investigations]", 8/29/73, *Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans: Final Operations with Respect to Intelligence Activities, quoted in* S. Rep. No. 94–755, *supra,* Bk. III, at 730–731 (1976).

  SUBJECT: [Cases Involving Surveillance of CIA Employees and Ex-employees]
  No surveillance, telephone tap, or surreptitious entry will be conducted against employees or ex-employees of the Agency outside

Agency property. In the event that threats to intelligence sources and methods appear from Agency employees or ex-employees, the appropriate authorities will be advised, and the Agency will cooperate with the appropriate authorities in the investigation of possible violation of law.
Memorandum of William Colby, *supra,* Attachment "Memorandum: [Investigation of CIA Employees and Ex-employees]," *quoted in Supplementary Detailed Staff Reports, supra,* at 731.

14. *Compare Weissman v. CIA, supra* note 5, 184 U.S.App.D.C. at 118–119, 565 F.2d at 693–694, *with Marks v. CIA, supra* note 3, 426 F.Supp. at 709.

15. *See, e. g.,* note 13 *supra; Weissman v. CIA, supra* note 5, 184 U.S.App.D.C. at 121 n.8, 565 F.2d at 696 n.8.

16. The CIA relies in part on recent Executive orders, which the Agency interprets to sanction the type of investigation undertaken in this case. *See* appellees' brief at 20–21; Executive Order 11905 § 4(b)(8), 3 C.F.R. 90, 96 (1977);

Marks had not had "contact" with the CIA for at least three years and had been working for a Senator serving on a committee with responsibilities for overseeing activities of the Agency. The potential for abuse in an investigation of someone in Marks' position is all too obvious and exemplifies the kind of danger Congress resolved to avoid by limiting the CIA's domestic investigative authority.[17] The majority opinion nonetheless pirouettes through this veritable mine field of troubling eventualities without confronting the spectre of CIA investigations of key legislative aides.

The conclusion that Congress has not authorized the CIA to conduct investigations such as the one in this case is reinforced by our observation that Congress has provided ample resources outside the CIA to satisfy any legitimate investigatory needs the Agency may have in circumstances such as those involved in this case. Investigations of American citizens within the United States are the responsibility of the Federal Bureau of Investigation (FBI), as the CIA itself apparently recognized in its earliest interpretation of its authorizing legislation.[18] The government has not contended in either this case or *Weissman* that the resources of the FBI were in any way inadequate to meet the CIA's investigatory needs, nor would such a finding serve to override the express intent of Congress.

Furthermore, a decision that the documents in suit were not "compiled for law enforcement purposes" would not result in disclosure of any information that could harm the legitimate functioning of the Agency or endanger national security. The Agency need not rely on Exemption 7 to protect such sensitive matters; other exemptions are quite adequate. Any matter whose release "could reasonably be expected to cause damage to the national security" can be classified pursuant to Executive order and withheld under Exemption 1. The CIA has apparently not found it appropriate to classify the four documents involved in this appeal, so Exemption 1 is not available in this case.

### III. EXEMPTION 3

The CIA also urges this court to affirm nondisclosure on the basis of Exemption 3 alone and to avoid reaching the Exemption 7 issue. As the majority opinion indicates, however, we are unable to follow this course, because the District Court's consideration of the Agency's Exemption 3 claim does not reflect the quality of *de novo* review required by the statute, *see Ray v. Turner*, 190 U.S.App.D.C. ——, ——, 587 F.2d 1187, 1196 *id.*, 190 U.S.App.D.C. at ——,

Executive Order 10236 §§ 1–604(a), 1–811, 2–208(c) (Jan. 24, 1978). The short answer to these arguments is that the Executive Branch cannot grant to one of its departments authority that Congress has specifically withheld. In addition, the passages relied on are not free from ambiguity, and the same Executive orders indicate an intent to limit severely the CIA's role in domestic intelligence investigations. *See, e. g.*, Executive Order 10236, *supra*, § 1–707 (senior officials in each agency in the Intelligence Community directed, "[i]n any case involving serious or continuing breaches of security, [to] recommend to the Attorney General that the case be referred to the FBI for further investigation").

17. The CIA would have this court distinguish this case from *Weissman* on the ground that the investigation of Marks was "a non-intrusive one, consisting of information obtained from informants, from public sources, and from CIA operations not directed against Marks." Appellees' brief at 15. The government's claim

that "there has been *no suggestion* that the CIA has engaged in *surveillance*, wiretapping, surreptitious entry, *or other intrusive activities* in connection with its investigation of Marks," *id.* (emphasis added), is hard to reconcile with the recently disclosed portions of Document 10 (photographs of Marks and others) and with certain allegations in Marks' affidavit, *supra* note 4, JA 42–43 (suspicion that former CIA employee answered Marks' ad as part of CIA investigation). The facts of this case thus illustrate the innate deficiencies of the CIA's "intrusiveness test" for determining the legality of the Agency's domestic investigations. When Congress has determined that the dangers of abuse justify a complete ban on domestic investigations of persons like Marks by the CIA, a court may not approve such an investigation merely because the Agency claims that none of the most egregious abuses took place in the particular case.

18. *See* note 13 *supra*.

587 F.2d at 1219–1221 (Wright, C. J., concurring), and does not indicate whether all the information withheld by the CIA, with the approval of the District Court, under Exemptions 3 *and 7* could be withheld under Exemption 3 alone, *see Weissman v. CIA, supra*, 184 U.S.App.D.C. at 123, 565 F.2d at 698.[19] Moreover, the District Court failed to establish whether any portions of the documents are segregable and therefore subject to disclosure. On remand, as the majority opinion instructs, the District Court must undertake this inquiry.

The District Court rejected appellant's motion for *in camera* inspection of the withheld documents, and its opinion on Exemption 3 dealt only with the legal issue whether Section 403(d)(3) of the National Security Act qualified as a statute specifically exempting materials from disclosure under the pre-amendment version of Exemption 3.[20] Although we have recently held that this statute still qualifies under Exemption 3 as amended, *Ray v. Turner, supra,* 190 U.S.App.D.C. at ——, 587 F.2d at 1196, the District Court's inquiry cannot end with this conclusion. As I pointed out in *Ray*, the District Court must also determine the conditions for exemption established by the exempting statute and decide whether the particular documents requested satisfy these conditions. *Id.,* 190 U.S.App.D.C. at ——, 587 F.2d at 1219–1221 (Wright, C. J., concurring). This determination may well

require the *in camera* inspection the District Court declined to undertake in this case.[21] Since the District Court's opinion does not reflect an adequate analysis of the factual issues involved, its consideration on remand should follow the procedures for *de novo* review outlined in *Ray v. Turner. Id.,* 190 U.S.App.D.C. at ——, 587 F.2d at 1219–1221 (Wright, C. J., concurring).

---

**19.** Exemption 7(D) is in at least one sense broader than Exemption 3 because it exempts not only information that would reveal confidential intelligence sources, but also *all* information provided exclusively by a confidential source, whether or not disclosing the information would reveal the identity of the source. The District Court must therefore inquire more carefully on remand into the possibility of releasing segregable portions of requested documents since Exemption 7 is not applicable. *See generally Mead Data Central, Inc. v. Department of the Air Force*, 185 U.S.App.D.C. 350, 368–370, 566 F.2d 242, 260–262 (1977).

**20.** *Marks v. CIA, supra* note 3, 426 F.Supp. at 709–711.

**21.** In denying *in camera* inspection the District Court found that Marks had failed to prove that the Agency had acted in bad faith. 426 F.Supp. at 710 n. 3. In his affidavit Marks

questions the good faith of the Agency as best he can on the basis of the limited information available to him, and he alleges the kind of facts that could easily be checked by a brief examination of the disputed documents. *See, e. g.,* Affidavit of John D. Marks, *supra* note 4, ¶ 6, JA 42–43 (discussing Document 7). It should be pointed out, however, that there need be no finding of bad faith on the part of an agency as a predicate for *de novo, in camera* review by the District Court. *See Halperin v. CIA,* 446 F.Supp. 661, 666–667 (D.D.C.1978) (despite specific finding of agency's good faith *in camera* inspection resulted in disclosure of additional information).