Gary A. WEISSMAN, Plaintiff-Appellant,

v.

CENTRAL INTELLIGENCE AGENCY et al., Defendants-Appellees.

No. 76–1566.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 24, 1976.

Decided Jan. 6, 1977.

As Amended on Denial of Rehearing April 4, 1977.

Mark H. Lynch, Washington, D.C., with whom Larry P. Ellsworth and Allan B. Morrison, Washington, D.C., were on the brief for appellant.

Frank A. Rosenfeld, Atty., Dept. of Justice, Pittsburgh, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellees.

Michael H. Stein, Atty., Department of Justice, Washington, D.C., also entered an appearance for appellees.

Before McGOWAN and TAMM, Circuit Judges and GESELL,* United States District Judge for the United States District Court for the District of Columbia.

Opinion for the Court filed by District Judge GESELL.

GESELL, District Judge:

This is an appeal arising under the Freedom of Information Act, 5 U.S.C. §§ 552 *et seq.* Appellant Weissman challenges an order of the District Court granting summary judgment in favor of the Central Intelligence Agency which refused to turn over certain documentary material to Weissman claiming that disclosure was not required because of three exemptions found in § 552(b) of the Act. The appeal focuses on the scope of these statutory exemptions as well as upon the procedures by which the availability of such FOIA exemptions is to be determined at the trial court level.[1]

In February, 1975, Weissman wrote the CIA expressing his alarm at news stories suggesting that investigative activities of the Agency had been directed against left-of-center political activists. Stating that he had been active in political reform during the 1960's, he requested "to see all files completed on me by the CIA." The CIA advised that "Unbeknown to Mr. Weissman he was considered for employment by this agency in the 1950's . . . ." A substantial amount of documentary material was thereafter released to Weissman. These papers disclosed that from 1958 to 1963 Weissman, without his knowledge or permission, was under a periodic but continuing investigation by the Agency for potential use as a witting agent to provide information about foreign activities in which he might participate, such as the VII Youth Festival held in Vienna in 1959. Detailed

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Appellees sought by tardy motion to have this appeal dismissed. The trial judge originally made a brief oral ruling and later, at defendants-appellees' request, particularized his findings of fact and conclusions of law, document-by-document, issued in conformity with *Schwartz v. IRS,* 167 U.S. App.D.C. 301, 511

F.2d 1303 (1975). Under all the circumstances the trial judge did not abuse his discretion in granting plaintiff-appellant's unopposed motion for extension. See Fed.R.Civ.P. 52(b); Fed.R. App.P. 4(a)(2). *Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.,* 371 U.S. 215, 83 S.Ct. 283, 9 L.Ed.2d 261 (1962). The motion to dismiss is without merit.

background checks were made, and provisional followed by final covert security approvals were granted. Although deemed qualified for undercover assignment, Weissman was never approached and he did not at any time seek employment with the Agency.

All or part of over 50 documents developed by the CIA during its investigation were withheld. Since much of this material gathered by the Agency was classified as confidential, contained information concerning agents' names, sources and procedures, or was considered part of an investigation compiled for law-enforcement purposes, the Agency in particularizing each document withheld claimed exemption under 5 U.S.C. § 552(b)(1), (3) or (7). After Weissman brought suit to compel disclosure, the Agency moved for summary judgment. Upon hearing the motion and considering the supporting affidavits, the District Court accepted the Agency's position. This appeal followed.

When Congress enacted the FOIA it recognized the obvious difficulties that would inevitably arise when disclosure was sought of documents touching on sensitive matters affecting law enforcement and national security. The Act, however, gave only general guidance in seeking to protect material of this type, and it has been left to the courts to develop standards and procedures in the light of experience with this delicate area.

The exemptions claimed in this instance, as set forth at 5 U.S.C. § 552(b), remove from the disclosure obligations of the FOIA matters that are

(b)(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of the national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(b)(3) Specifically exempted from disclosure by statute;

(b)(7) investigatory records compiled for law enforcement purposes . . . [subject to some conditions].

## I. EXEMPTION UNDER 5 U.S.C. § 552(b)(3)

 In this instance, the Agency placed principal reliance on exemption (b)(3).[2] The Central Intelligence Act of 1949 provided at 50 U.S.C. § 403g that "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency" shall be protected from disclosure. In addition, Section 403(d)(3) of this Title provides, "That the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." The directive that the CIA protect its sources is especially broad, protecting not only the name of the source but, to the extent the Agency considers reasonable to protect the source, the nature and type of information supplied. While appellant vigorously asserts that § 403(d)(3) is not a statute within the exemption, the legislative history clearly demonstrates [3] that both § 403(d)(3) and § 403g are precisely the type of statutes comprehended by exemption (b)(3). Appellant's contention, moreover, has now been rejected. *Phillippi v. Central Intelligence Agency,* 178 U.S.App.D.C. 243, 546 F.2d 1009 (1976), n. 14.

## II. EXEMPTION UNDER 5 U.S.C. § 552(b)(7)

The Agency also withheld material pursuant to exemption (b)(7) which shields from disclosure certain records compiled for law-enforcement purposes. This claim to exemption is misplaced, as appellant strenuously contends.

---

**2.** This exemption has been modified effective March, 1977, but the Court is concerned here only with the present statutory language.

**3.** The Conference Report on the 1974 Amendments to the FOIA notes, ". . . intelligence sources and methods (50 U.S.C. § 403(d)(3) and

(g) ), for example, may be classified and exempted under section 552(b)(3) of the Freedom of Information Act." H.R.Rep. 93–1389, 93d Cong., 2d Sess., 12 (1974); *see also* S.Rep.No. 93–854, 93d Cong., 2d Sess., 16 (1974).

To be sure, it appears from the sparse record available that the CIA investigation of Weissman, an American citizen, may well have been a genuine attempt to determine whether he was a safe candidate for recruitment by the Agency. Accepting this as a fact, however, it is clear that the CIA nonetheless conducted an intermittent but extensive investigation over a five-year period of an American citizen living at home, without his knowledge. It cannot be contended that this activity was for law-enforcement purposes.

The National Security Act of 1947, which created the CIA [4] and empowered it to correlate and evaluate intelligence relating to the national security, specifically provided that the "Agency shall have no police, subpena, law-enforcement powers, or internal-security functions." 50 U.S.C. § 403(d)(3). This directive was intended, at the very least, to prohibit the CIA from conducting secret investigations of United States citizens, in this country, who have no connection with the Agency.

The Agency has been given far-reaching authority to gather information and to conduct intelligence activities abroad. These vital functions are liberally financed and concern national security. It is generally accepted that the Agency, in both its reporting and operational functions, serves an essential role in the development and implementation of foreign policy. The Agency, of course, proceeds in secret. Many of its operations are covert, and since the stakes are high few are in a position to know or to question the manner by which it carries out its work. It has the power that flows from money and stealth. Congress was well aware such activities create a potential for abuse, and chose to limit the Agency's activities to intelligence gathering abroad. It was unwilling to make it a policeman at home, or to create a conflict between the CIA and the FBI.

The legislative history of the CIA enabling act is sketchy, but these concerns are abundantly clear. Congress wisely sought from the outset to make sure that when it released the CIA genie from the lamp, the Agency would be prevented from using its enormous resources and broad delegation of power to place United States citizens living at home under surveillance and scrutiny. It denied the Agency police or internal-security functions to obviate the possibility that overzealous representatives of the CIA might pry into the lives and thoughts of citizens whose conduct or words might seem unconventional or subversive. Thus, during floor debates in the House, for example, a member of the Committee which considered the legislation stated:

This Central Intelligence Agency is supposed to collect military intelligence abroad, but we want to be sure it cannot strike down into the lives of our own people here. So, we put in a provision that "the Agency shall have no police, subpena, law-enforcement powers, or internal-security functions."

93 Cong.Rec. 9444 (1947) (remarks of Congressman Judd).

Congress had a realistic fear of secret police that would move inward rather than outward, and assume prerogatives never intended. While the 80th Congress obviously, and for good reason, wished to protect America's security, it had no intention of making the mistake of creating an American "Gestapo." [5] As the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("Church Committee") recently reported, "By codifying the prohibition against police and internal security functions, Congress apparently felt that it had protected the

**4.** Under a Presidential Directive, 11 Fed.Reg. 1339 (Feb. 1946), the Agency had temporarily operated as the Central Intelligence Group (CIG).

**5.** The fear of creating a secret police and the intention to avoid such an error pervaded congressional consideration of the new intelligence agency. *See, e. g.,* 93 Cong.Rec. 9413 (1947)

(remarks of Congressman Harness); Senate Armed Services Committee, Hearings on S. 758, 80th Cong., 1st Sess. 497 (1947) (remarks of General Vandenberg); House Expenditure in the Executive Department Committee, Hearings on H.R. 2319, 80th Cong., 1st Sess. 127, 438, 479–481 (1947).

American people from the possibility that the CIA might act in any way that would have an impact upon their rights." [6]

 In spite of this congressional awareness and insistence, the CIA hopes to find support for this type of investigation into a citizen's background by reference to 50 U.S.C. § 403(d)(3), which, while denying the CIA any internal security functions, also states ". . . the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." This provision contains no grant of power to conduct security investigations of unwitting American citizens. As the Rockefeller Commission noted,[7] and as the Church Committee stated, the provision

> . . . was not viewed as conveying new authority to investigate; rather it charged the Director of Central Intelligence Agency with responsibility to use the authority which he already had to protect sensitive intelligence information.

S.Rep.No.94–755, *supra,* Book I at 139. Whatever may be the power to check on its own personnel,[8] we are obliged to agree with the Church Committee when it commented on § 403(d)(3):

> Given the prohibition against internal security functions, it is unlikely that the provision was meant to include investigations of private American nationals who had no contact with the CIA, on the grounds that eventually their activities might threaten the Agency.
>
> S.Rep.No.94–755, *supra,* Book I, 139. *See also,* Report to the President, *supra,* at 165–166.

**6.** S.Rep.No.94–755, 94th Cong., 2d Sess. Book I, 138 (1974).

**7.** Report to the President, Commission on CIA Activities Within the United States, 53 (1975).

**8.** In its recommendations to the President, the Rockefeller Commission suggested that the CIA be given power to investigate persons "being considered for affiliation" with the CIA, "or others who require clearance by the CIA to receive classified information." Report to the President, *supra,* at 66. In its Recommendations, the Church Committee suggested that the CIA not be allowed to investigate through

Thus, the Agency's interpretation of the sources and methods proviso is misplaced. A full background check within the United States of a citizen who never had any relationship with the CIA is not authorized, and the law-enforcement exemption is accordingly unavailable. The Agency simply has no authority in the guise of law enforcement to make such a background check of Weissman with a view to his possible recruitment.

### III. IN CAMERA INSPECTION

Finally, appellant contends that by refusing to conduct an *in camera* examination of documents before sustaining Agency claims of exemption under sections (b)(1), (3) and (7), the District Court failed to follow proper procedures. He asserts that an *in camera* inspection of documents withheld under (b)(1) was especially necessary because the affidavits were not sufficiently detailed to permit scrutiny of the Agency claims. He also urges that the *in camera* procedure was required to check the truthfulness of Agency claims under each exemption, and to conduct a line-by-line analysis of documents withheld under each exemption to cull out any non-exempt material.

 While the FOIA itself now provides for *in camera* inspections, 5 U.S.C. § 552(a)(4)(B),[9] it is clear from the legislative history that this section merely "permit[s] such *in camera* inspection at the discretion of the Court." H.R.Rep.No.93–1380, Conference Rep. 93d Cong., 2d Sess., 9 (1974). As Congress indicated, before the Court orders *in camera* inspection, the

surveillance any American national not affiliated with the CIA; but should be allowed to collect information through confidential interviews about "individuals or organizations being considered by the CIA as potential sources of information. . . ." S.Rep.No.94–755, *supra,* at Book II, 302–303.

**9.** "[T]he court . . . *may* examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) . . . .." § 552(a)(4)(B) (emphasis added).

Government should be given the opportunity to establish by means of testimony or detailed affidavits that the documents are clearly exempt from disclosure.

> *Ibid.* See also, S.Rep.No.93–854, 93rd Cong., 2d Sess. 15 (1974).

We adopted this view in *Vaughn v. Rosen*, which specified that where the public record is sufficient to permit a legal ruling, the inquiry need go no further, 157 U.S.App. D.C. 340, 484 F.2d 820, 824 (1973); *see also, Environmental Protection Agency v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), and indicated in *Phillippi v. Central Intelligence Agency, supra,* that *in camera* proceedings are particularly a last resort in "national security" situations.

The reluctance of Congress and the Courts to require *in camera* inspection is well founded. *In camera* inspections are burdensome and are conducted without the benefit of an adversary proceeding. *Vaughn, supra,* at 824. A denial of confrontation creates suspicions of unfairness and is inconsistent with our traditions.

Additional considerations apply to *in camera* proceedings under exemption (b)(1) where classification of documents is involved. Few judges have the skill or experience to weigh the repercussions of disclosure of intelligence information. Congress was well aware of this problem when it amended the FOIA to permit *in camera* inspection in exemption (b)(1) cases.[10] If ex-

emption is claimed on the basis of national security the District Court must, of course, be satisfied that proper procedures have been followed, and that by its sufficient description the contested document logically falls into the category of the exemption indicated. In deciding whether to conduct an *in camera* inspection it need not go further to test the expertise of the agency, or to question its veracity when nothing appears to raise the issue of good faith.

■ In every FOIA case, there exists the possibility that Government affidavits claiming exemptions will be untruthful. Likewise, in every FOIA case it is possible that some bits of non-exempt material may be found among exempt material, even after a thorough agency evaluation. If, as appellant argues, these possibilities are enough automatically to trigger an *in camera* investigation, one will be required in every FOIA case.[11] This is clearly not what congress intended, nor what this Court has found to be necessary.

■ When Congress amended the FOIA in 1974 to provide that any reasonably segregable non-exempt portion of an agency record should be released, 5 U.S.C. § 552(b) (Pub.L. 93–502 § 2(c) ), this addition was meant to endorse judicial decisions holding that Congress did not intend to exempt an entire document "merely because it contained some confidential information."[12]

---

**10.** Claims under (b)(1), like other claims of exemption, are subject to *de novo* review in the District Court. *See* 5 U.S.C. § 552(a)(4)(B). However, the legislative history of the 1974 amendments makes clear that, in evaluating (b)(1) claims under this standard, "substantial weight" is to be accorded to detailed agency affidavits setting forth the basis for exemption:

> [T]he conferees recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse effects might occur as a result of public disclosure of a particular classified record. Accordingly, the conferees expect that the Federal courts, in making *de novo* determinations in section 552(b)(1) cases under the Freedom of Information Act, will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record. S.Rep. 93–1200, 93d Cong., 2d Sess. 12 (1974), U.S.Code Cong. & Admin.News, 1974, p. 6290.

*See also* Senator Muskie's remarks during the floor debate preceding the Senate's vote to override President Ford's veto of the amendments. 120 Cong.Rec. 36870 (1974) ("The judge would be required to give substantial weight to the classifying agency's opinion in determining the propriety of the classification.")

**11.** It should be noted that this is no small matter. The number of FOIA complaints filed in the District of Columbia tripled this past year and totalled 183 cases. It should also be noted that 30 percent of the closed cases are appealed to this Court. (The national average rate of appeals for all cases is nine percent.) *In camera* inspection in each FOIA case would create a staggering burden both for this Court and the District Court.

**12.** *Grumman Aircraft Engineering Corp. v. Renegotiation Bd.,* 138 U.S.App.D.C. 147, 149, 425 F.2d 578, 580 (1970), quoted in S.Rep.No.93–854, 93d Cong., 2d Sess. 31 (1974).

But, neither the legislative history, nor court decisions, have indicated that it was appropriate for the District Courts to undertake a line-by-line analysis of agency records in each case. This Court has noted the difficulty of such a task, and held that such an investment of judicial energy was not justified, or even permissible. *Vaughn v. Rosen, supra,* at 825. "The burden has been placed specifically by statute on the Government." *Ibid.* It is only where the record is vague or the agency claims too sweeping or suggestive of bad faith that a District Court should conduct an *in camera* examination to look for segregable non-exempt matter.

■■■■ The CIA dealt with the instant request in a conscientious manner. It disclosed much material, it released additional material as the result of an administrative appeal, and it came forward with newly discovered documents as located. Agency documents have been released to plaintiff-appellant on four separate occasions.[13] The Agency submitted affidavits summarizing each document, or portion of a document withheld, and indicated the rationale for each claimed exemption. It filed an indexed description of all material withheld, and supported the withholding by explicit affidavits. No discovery was attempted; plaintiff simply contested the adequacy of the affidavits. There is no reason, on this record, to presume bad faith on the part of the CIA. In this instance, the CIA released some documents in their entirety and portions of 22 others. From the deletions in the partially released documents, and the Agency explanations for these deletions, the District Court could well determine that the Agency was not improperly withholding

information. Such an examination of a full record can take the place of a partial, or sampling, *in camera* inspection. *See Ash Grove Cement Co. v. FTC,* 167 U.S.App.D.C. 249, 511 F.2d 815 (1975). The District Court was correct in refusing to conduct an *in camera* inspection to check the veracity of Agency claims or to search for non-exempt material and no abuse of discretion has been shown. Where it is clear from the record that an agency has not exempted whole documents merely because they contained some exempt material,[14] it is unnecessary and often unwise for a court to undertake such an examination.

## IV. CONCLUSION

As the above discussion indicates, the trial judge was well within his discretion in refusing to order an *in camera* examination. The Agency claims for exemptions under section (b)(1) and (b)(3) were properly sustained. However, exemptions under section (b)(7) are not available to the CIA except under special collateral circumstances.[15] There are 29 documents where claims for exemption under various subsections of (b)(7) were made. While in most instances these claims were coupled with claims under (b)(3), it is still necessary to remand the case to the District Court to determine whether all or part of any of the 29 documents should be released. The Agency may well be able to show that the claim of exemption (b)(3) alone, or coupled with other exemptions, is sufficient to protect the document against disclosure even in the absence of (b)(7), but this cannot be ascertained on the basis of the papers brought here on the appeal.

---

**13.** On May 16, 1975, portions of two documents were released. On July 3, 1975, additional portions of those two documents were released, and portions of seven more documents that had been discovered after the initial Agency reply. On January 8, 1976, portions of nine additional documents and one entire document were released. On January 29, 1976, 15 more documents, or portions thereof, including some portions previously deleted, were released.

**14.** In some limited instances a stronger standard may apply. *See, e. g., Cuneo v. Schlesin-*

*ger,* 157 U.S.App.D.C. 368, 484 F.2d 1086 (1973), where the issue was whether "secret law" was being withheld. However, we do not deal with that issue here.

**15.** For example, in the case of three documents, Nos. 12, 44 and 46, an exemption under (b)(7) was claimed to protect the names of FBI law enforcement officers. The exemption was properly claimed in this instance in conjunction with the claims for exemption of the same three documents under exemptions (b)(1) and (3).

The judgment below is affirmed in all respects except as it relates to documents claimed to be exempt under section (b)(7), other than Nos. 12, 44 and 46, and the case in this respect alone is remanded to the District Court for further proceedings consistent with this opinion.