Alan Jules **WEBERMAN**

v.

**NATIONAL SECURITY AGENCY and Admiral Inman, Director.**

**No. 77 Civ. 5058.**

United States District Court,
S. D. New York.

Memorandum and Order April 3, 1980.

On Reargument June 4, 1980.

---

**10**

Jan H. Brown, New York City, for plaintiff.

John S. Martin, Jr., U. S. Atty., by Leslie R. Bennett, Asst. U. S. Atty., S. D. New York, New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By motion docketed December 21, 1979 and fully submitted for decision on January 30, 1980, defendants National Security Agency ("NSA") and Admiral Inman seek an order granting summary judgment pursuant to Rule 56, F.R.Civ.P., dismissing plaintiff's action to obtain a document under the Freedom of Information Act ("FOIA").

Admiral Inman also seeks an order pursuant to Rule 12, F.R.Civ.P., dismissing the complaint against him for failure to state a claim. On January 10, 1980, plaintiff filed papers in opposition, in which he also moved for summary judgment on his FOIA claim, and, in the alternative, requested *in camera* inspection by the Court of the requested document. The complaint, filed October 17, 1977, alleges a violation of the FOIA, 5 U.S.C. § 552(a), *et seq.*, arising out of defendant's refusal to respond to plaintiff's request for the disclosure of a document. Subject matter jurisdiction is founded upon 5 U.S.C. § 552(a)(4)(B). As to defendant Inman, this action is frivolous. He is not a proper party defendant and no claim is stated as to him. This complaint was originally filed *pro se*. Counsel who has subsequently been retained by plaintiff does not dispute the point. As to defendant Inman, the complaint is dismissed. An FOIA action may be brought only against a federal agency, not against individuals or the Government itself. *Morpurgo v. Bd. of Higher Educ.*, 423 F.Supp. 704, 714 fn. 26 (S.D.N.Y.1976).

The relevant facts are not in dispute. Plaintiff describes himself as a serious historian, and author of a published work entitled "Coup D'Etat in America," interested in acquiring additional knowledge concerning an historical event of legitimate public interest; the assassination, on Nov. 22, 1963 at Dallas, Texas, of President John F. Kennedy.

The Court will treat the request as made in good faith for the purpose of satisfying a legitimate curiosity shared by many concerning a mysterious series of events which happened more than sixteen years ago. It will be recalled that J. Harvey Oswald al-

legedly shot the President, and later, at a different location, shot and killed Dallas Police Officer Tippett with a different weapon. Taken into custody following the second killing, Oswald was shot and killed, on national television, by Jack Ruby. This before he had been arraigned or had given any statement which might have identified possible co-conspirators.

The NSA received a letter from plaintiff on March 10, 1977 requesting a copy of a document described by him as a telegram or message sent by Jack Ruby's brother, Earl Ruby, from Cobo Cleaners, 18135 Livernois, Detroit, Michigan to Havana, Cuba on April 1, 1962. By letter dated March 24, 1977 a NSA information officer, Norman Boardman, denied the request, asserting that (1) the fact of the existence or non-existence of the information requested was classified, and the plaintiff was not a person authorized to receive classified information, 5 U.S.C. § 552(b)(1); and (2) the information was exempt from disclosure under 5 U.S.C. § 552(b)(1) and (3). Plaintiff's administrative appeal of this decision by letter postmarked April 19, 1977 was denied by letter of William J. Jenkins dated May 10, 1977 for the same reasons.[1] The plaintiff then filed this action.

In support of its motion, defendant contends first that NSA's refusal to provide plaintiff with the requested information was justified under 5 U.S.C. § 552(b)(1) ("Exemption 1") because Executive Order 12065 properly classified the existence or non-existence of the document as "Secret." It will be understood that the message, if it exists, was transmitted by telegraphic means from Detroit, Michigan to a so-called "Gateway City" of which New York is one, from which it was transmitted to the Republic of Cuba either by transoceanic cable or wireless, either directly, or more likely, through facilities of another nation. One of the two affidavits submitted by John R. Harney, Assistant Director for Policy and Liaison at NSA, explains that a primary function of the agency is to intercept foreign communications to obtain foreign intelligence. However, because of the enormous amounts of communications and lines carrying those communications, NSA focuses on particular lines which are apt to yield the highest volume of useful foreign intelligence information. If NSA were forced to disclose documents which revealed the particular lines being monitored, a foreign power might obtain this information and withhold future communications over these lines, thereby causing NSA to lose a valuable source of information and rendering NSA more vulnerable, with concomitant injury to national security. Harney concludes that the fact of existence or non-existence of the message sent by Earl Ruby is properly classified as Secret by Executive Order 12065, because disclosure of such a fact would reveal that NSA did or did not monitor and intercept communications on a particular line or route on April 1, 1962.

Defendants also contend that their refusal to provide the requested information to plaintiff was proper under 5 U.S.C. § 552(b)(3) ("Exemption 3"), because several statutes protect disclosure of information concerning the communications intelligence activities of NSA.

---

1. The telegram is no mere figment of plaintiff's imagination. Earl Ruby, sender of the telegram, testified in September, 1978 before the Select Committee on Assassinations of the House of Representatives. His public interrogation, undoubtedly observed by foreign intelligence operatives, was printed in Vol. IV of the Hearings. It is and was available on request to any journeyman spy from the Government Printing Office. Earl Ruby admitted under oath that he was the owner of Cobo Cleaners, in Detroit, Michigan, and that he was then "aware" that "on April 1, 1962 a telegram was sent from Cobo Cleaners to Havana, Cuba," and that this was not a "normal occurrence" in his retail dry cleaning enterprise. Although Earl Ruby had tried to suggest that the telegram might have been sent to a United States community named "Cuba," of which there are at least six such places, in Alabama, Illinois, Kansas, New Mexico, New York and Ohio, it appears from the Warren Commission record, also available to anyone, that an Internal Revenue Service investigation of Earl Ruby confirmed that the telegram was in fact sent to Havana, Cuba. Earl Ruby denied under oath that he was the sender.

Plaintiff replies that the fact of existence or non-existence of the requested information is not properly classified as Secret under Executive Order 12065, and therefore not exempt from the FOIA requirements by Exemption 1, because the NSA monitoring program that intercepted this message, called "Shamrock," is a matter of public record in a Senate Committee report, the Senate Committee to Study Governmental Operations, Supplementary Staff Reports on Intelligence Activities and the Rights of Americans, Report No. 94–755, 94th Congress, 2d Sess. (1976) (hereinafter referred to as the Church Committee Report).

There is nothing Secret or Confidential now about Operation Shamrock, if we assume as we must that the unnamed unfriendly foreign intelligence subscribes to the publications of the U.S. Government Printing Office and can read English. Its cover has been blown by the Church Committee which has revealed for all to read, that:

> "SHAMROCK is the codename for a special program in which NSA received copies of most international telegrams leaving the United States between August 1945 and May 1975. Two of the participating international telegraph companies—RCA Global and ITT World Communications—provided virtually all their international message traffic to NSA. The third, Western Union International, only provided copies of certain foreign traffic from 1945 until 1972. SHAMROCK was probably the largest governmental interception program affecting Americans ever undertaken. Although the total number of telegrams read during its course is not available, NSA estimates that in the last two or three years of SHAMROCK's existence, about 150,000 telegrams per month were reviewed by NSA analysts [footnote omitted].
>
> Initially, NSA received copies of international telegrams in the form of microfilm or paper tapes. These were sorted manually to obtain foreign messages. When RCA Global and ITT World Communications switched to magnetic tapes in the 1960's, NSA made copies of these tapes and subjected them to an electronic sorting process.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Obtaining the international telegrams of American citizens by NSA at the offices of the telegraph companies appears to violate the privacy of these citizens, as protected by the Fourth Amendment. That Amendment guarantees to the people the right to be 'secure . . . in their papers . . . against unreasonable searches and seizures.' It also provides that 'no Warrants shall issue, but upon probable cause.' In no case did NSA obtain a search warrant prior to obtaining a telegram.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [I]n early September the [NSA] gave the Committee its first detailed information. This briefing was followed by interviews with present and former NSA employees who had been responsible for the program and by examinations of documents at NSA and the Department of Defense. NSA assured the Committee at the time that it had examined all NSA documents which pertained to SHAMROCK. On September 23, [1975] the full Committee was briefed by an NSA official in executive session. Following this briefing, the Committee interviewed officials in the telegraph companies which had participated in the SHAMROCK program.
>
> On the basis of this investigation, the Committee prepared a report which it submitted to NSA for review. NSA had no specific comments regarding the accuracy of the report, but expressed its general objection to public disclosure of the operation on the grounds that the report was based on classified information. [Footnote omitted].
>
> On November 6, 1975, in a public session of the Committee, Chairman Frank Church read the report on SHAMROCK into the record."

(Report of Hearings before the Select Committee to Study Governmental Operations With Respect to Intelligence Activities of the United States Senate, 94th Congress, pp. 765, *et seq.*).

Plaintiff argues that the three statutes cited by defendant do not justify NSA's refusal to comply with his request. As an alternative, plaintiff seeks to have this Court review the requested document *in camera*, if it exists, to determine whether it is exempt from disclosure. No purpose or benefit is perceived from such an *in camera* inspection.

The issue in this case is not whether the Ruby message itself is exempt from disclosure. Clearly it is not. Rather, this Court must determine whether NSA properly withheld the fact of existence or non-existence of the information requested by plaintiff. Because there are no questions of material fact, the issue is solely one of law. The decision of the NSA is subject to *de novo* review by this Court, 5 U.S.C. § 552(a)(4)(B), and the burden is on NSA to sustain its decision. *Founding Church of Scientology v. National Security Agency*, 610 F.2d 824 (D.C.Cir. 1979). However, the affidavits submitted on behalf of NSA must be accorded substantial weight. *Id.* With this in mind, we turn to a discussion of the exemptions relied on by the Agency in reaching its decision.

Exemption 1 of the FOIA, 5 U.S.C. § 552(b)(1), permits an agency to refuse disclosure of matters that are:

"(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."

Executive Order 12065, 43 Fed.Reg. 28949, effective December 1, 1978, now found in 5 C.F.R. § 294.1001, provides that information which concerns "intelligence activities, sources, or methods," may be classified as Secret if unauthorized disclosure of such information "reasonably could be expected to cause serious damage to the national security." This same information may be classified as Confidential, a lower status, if unauthorized disclosure "reasonably could be expected to cause identifiable damage to the national security." *Id.* Executive Order 12065 further provides that no

agency may refuse to confirm the existence or non-existence of a requested document "unless the fact of its existence or non-existence would itself be classifiable." *Id.* Thus, the initial question is whether the existence or non-existence of the Ruby telegram is a fact properly classified and classifiable as Secret or Confidential, so that it is exempt under Exemption 1.

The affidavits submitted by Mr. Harney assert that mere confirmation or denial by NSA of the existence of this 1962 telegram to Cuba would reveal that certain lines of communication are *now* surveilled by NSA, and that this revelation would be expected to cause specific and identifiable harm to national security. Therefore, defendants contend that the fact of existence or non-existence was properly classified as Secret, or was classifiable as Confidential at the very least.

I cannot accept this conclusion. In my view, the two affidavits submitted by Harney do not logically support a Secret or Confidential classification by NSA. *Weissman v. Central Intelligence Agency*, 565 F.2d 692 (D.C.Cir. 1977). Without such a classification, defendants cannot rely on Exemption 1. A careful reading of the affidavits reveals that Harney contradicts himself on an essential point. On the one hand, he states that the communications lines targeted for NSA surveillance, and NSA's capability to intercept traffic on those lines, are facts which must be guarded closely to prevent "foreign intelligence" from gaining any advantage in the cold war of espionage. Harney asserts that an admission by NSA of so small and insignificant a fact as the existence or non-existence of the 1962 Ruby message might be used by unidentified foreign powers to decipher, or even defeat NSA's *current ongoing* intelligence gathering process, with resulting dire consequences. On the other hand, however, Harney concedes, as he must, that NSA in 1962 used several different sources and methods to gather information or to monitor international traffic, including the since discontinued SHAMROCK operation referred to by plaintiff. He then argues that

even if we assume that NSA has the requested message, "it would not be possible to ascertain whether such material had been derived from the Shamrock, or another, source," If this is true, and *NSA* cannot ascertain which collection source (SHAMROCK, or some other method) obtained the Ruby message, how can it be said that foreign intelligence could discover or ascertain that source? Such a result would suggest the absurd conclusion that certain foreign powers already know more about NSA's operations than NSA does. Furthermore, even if NSA admitted that it possessed this message, and a foreign power inferred that the telegram was or was not obtained through SHAMROCK, no benefit or detriment accrues to either side. The Church Committee Report, *supra*, clearly states that the SHAMROCK program required no special technology, as international telegrams were turned over voluntarily by the participating domestic telegraph companies themselves. This is a matter of public record, and it is difficult to imagine how an admission of the existence of a message which could have been and probably was obtained in such a way in 1962, will reveal anything about NSA's current interception or surveillance processes than has been inferred already from the Church Committee report.

I conclude that defendant has failed to show that confirmation or denial of the existence of the requested information would create potential harm to the national security, and also that the requested information was improperly classified under Executive Order 12065. Accordingly, defendant cannot rely on Exemption 1.

Defendant relies alternatively on Exemption 3 of the FOIA, 5 U.S.C. § 552(b)(3), which states that disclosure under the FOIA is not required with respect to matters that are

"specifically exempted from disclosure by statute . . ., provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for with-holding or refers to particular types of matters to be withheld."

Defendant contends that three statutes specifically exempt from disclosure the fact of existence or non-existence of the Ruby message. The first statute relied on is Public Law No. 86–36, § 6, 50 U.S.C. § 402 (note) ("Section 6"), which provides:

"(a) Except as provided in subsection (b) of this section, nothing in this Act or any other law (including, but not limited to, the first section and section 2 of the Act of August 28, 1935 (5 U.S.C. 654) . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of the names, titles, salaries, or number of the persons employed by such agency."

Section 6 has been held to be a statute within Exemption 3. *Hayden v. National Security Agency*, 608 F.2d 1381 (D.C. Cir. 1979); *Founding Church of Scientology v. National Security Agency, supra*. Therefore, the issue is whether the affidavits submitted on behalf of NSA demonstrate that confirming or denying the existence of the requested message will reveal information integrally related to a specific NSA activity. *Hayden v. National Security Agency, supra*, at 1390. A showing of potential harm to national security, which *is* necessary under Exemption 1, is not required under Exemption 3. *Id.*

On the basis of these affidavits, it seems clear that the existence or non-existence of the Ruby message is a fact which, if disclosed, would reveal no secrets about a specific NSA communications intelligence operation in effect now, nor would it reveal secrets about 1962 practices. We noted earlier that the method of collecting international communications through the SHAMROCK operation was a matter of public record in the Church Committee reports. If the telegram does in fact exist, a foreign power could only guess whether the Ruby telegram was intercepted in the SHAMROCK operation, or by some other, separate procedures. By confirming or denying the

existence of this telegram, NSA is only disclosing whether it did in fact intercept the telegram. It is not exposing any specific interception operation, nor is it telling how, because it is as likely as it is unlikely that this message was passed manually within the United States to NSA by a participating telegraph company under the SHAMROCK operation.

Of course, all information gathered by NSA relates in some way to an NSA activity, simply because the gathering itself is an activity of the Agency. However, the underlying policy of the FOIA, which favors full disclosure, requires a more realistic construction of Section 6. See, *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). I conclude that the fact of existence or non-existence of the telegram requested by plaintiff will not reveal any non-public information related to a specific NSA activity, and thus defendant is not entitled to an exemption under 50 U.S.C. § 402, referred to as Section 6.

For reasons similar to those discussed above, the remaining two statutes relied on by defendant under Exemption 3 do not justify NSA's failure to disclose. Title 50 U.S.C. § 403(d)(3) provides in relevant part that the Director of Central Intelligence "shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." Title 18 U.S.C. § 798(a), also relied on by defendant, provides that any person who furnishes or otherwise makes available to an unauthorized person any classified information concerning the communication intelligence activities of the United States shall be guilty of a crime.

Disclosure of items which would violate either of these statutes have been found to be within Exemption 3. See, *Goland v. Central Intelligence Agency*, 607 F.2d 339 (D.C.Cir. 1978); *Baez v. National Security Agency*, No. 76–1921 (D.D.C. April 7, 1978). However, the discussion thus far clearly shows that confirmation or denial by NSA of the existence of the Ruby message, in the factual context of this particular case will neither disclose "intelligence sources or methods," 50 U.S.C. § 403(d)(3), nor will NSA be furnishing "classified information . . . concerning the communication intelligence activities." 18 U.S.C. § 798(a). I conclude that defendants have failed to prove that they are entitled to withhold the requested information under Exemption 3 of the FOIA.

Accordingly, plaintiff's motion for summary judgment is granted against NSA. Settle a final judgment on five (5) days notice which shall dismiss as to Admiral Inman and shall direct disclosure of whether or not the message referred to in the complaint exists, and if it does, shall direct a copy be furnished to plaintiff by NSA. Such judgment shall contain a stay pending appellate finality.

So ordered.

BRIEANT, District Judge.

#### On Reargument

By motion docketed April 30, 1980, but not fully submitted until June 2, 1980, the Government seeks reargument on this Court's memorandum and order of April 3, 1980, which granted plaintiff's motion for summary judgment and directed that defendant National Security Agency ("NSA") comply with plaintiff's request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a), *et seq.* The motion to reargue was granted, and oral argument was heard on May 29, 1980. Familiarity with our prior decision dated April 3, 1980 is assumed. On reconsideration of this case, the Court adheres to its original decision, and declines the Government's offer to submit an identified classified "Top Secret" affidavit of Michie F. Tilley, NSA's Director of Policy and Liaison ("the Top Secret *ex parte* affidavit") for review *in camera*.

At issue is whether the existence or non-existence of a telegram, sent by Earl Ruby from his dry-cleaning establishment in Detroit, Michigan, to Havana, Cuba on April 1, 1962, was a fact properly withheld as classified. It will be remembered that in November, 1963 Jack Ruby, brother of Earl

Ruby, shot and killed Lee Harvey Oswald in the police station at Dallas, Texas. Oswald, in turn, was then in custody charged with the assassination of President John F. Kennedy.

Plaintiff, believing from public records that the document exists in defendants' possession, requested it under the FOIA. This Court held that confirmation or denial of the existence of the telegram is not a fact exempt from disclosure under the FOIA, 5 U.S.C. §§ 552(b)(1) and (3). In reaching this conclusion, the Court reviewed carefully the two affidavits submitted by John R. Harney, then Assistant Director for Policy and Liaison at NSA, and accorded them substantial weight. *Founding Church of Scientology v. National Security Agency*, 610 F.2d 824 (D.C. Cir. 1979). These affidavits disclosed that NSA used several different sources and methods to monitor such international traffic or to gather information, including a program called "SHAMROCK" through which " . . . NSA received copies of most international telegrams leaving the United States between August 1945 and May 1975" from three international telegraph companies. Report of Hearings before the Select Committee to Study Governmental Operations With Respect to Intelligence Activities, 94th Congress, pp. 765, *et seq.* Mr. Harney himself stated in one of his affidavits that, even if we assume that NSA has the requested telegram, "it would not be possible [for him] to ascertain whether such material had been derived from the Shamrock, or another source." From this information, the Court concluded as a matter of logic that if it is impossible for NSA to discern which intelligence gathering source or method produced the copy of the telegram at issue, then it would be equally impossible for a hostile foreign power to discover that information, or identify the actual method of interception and processing used by NSA in 1962. This assumed, of course, that the foreign power does not already possess this information, which would render useless all of NSA's efforts to protect it.

Therefore, this Court concluded and still believes that disclosing the existence or non-existence of the copy of the telegram will not reveal the source or method of intercepting or processing certain information by NSA. The telegram could have been obtained through any number of sources and methods, covert and overt, so a foreign power can only guess as to which has been used in this particular case. Accordingly, the two exemptions to disclosure under the FOIA relied on by the Government were regarded as inapplicable here, and plaintiff's request was granted.

The Government's memorandum of law in support of its motion for reargument asserts that the Court misinterpreted the facts and the law of this case. However, it fails to refute the reasoning set forth above.

■ In further support of its position, the Government offers to submit for this Court's *in camera* review, the identified affidavit, classified "Top Secret" of Michie F. Tilley, NSA's Director of Policy and Liaison. This "Top Secret" affidavit is represented as explaining in greater detail, the potential harm to national security that would arise if NSA were forced to disclose the 1962 telegram, or confirm or deny its existence in this case at this time.

The FOI Act provides that a court " . . *may* examine the contents of . . . agency records *in camera* to determine whether *such records* or any part thereof shall be withheld under any of the exemptions . . . ." 5 U.S.C. § 552(a)(4)(B). This exercise of the Court's discretion was recently extended in *Phillippi v. Central Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976), which held that a district court *may* examine classified affidavits *in camera* where the agency will neither confirm nor deny the existence of requested records, and there are no relevant documents for the Court to examine other than affidavits which explain the agency's refusal. Nevertheless, the Court of Appeals in *Phillippi* recognized that *in camera* review is not necessary in every case, and the statute clearly provides that reliance on such an unusual procedure is within the discretion of the district court.

In the instant case, I decline as a matter of discretion to review this classified affidavit *in camera*, essentially for two reasons. First, the open affidavits submitted by NSA set forth sufficient undisputed relevant facts necessary to reach a decision on plaintiff's request. Indeed these now public facts compel the decision reached. Any classified information will serve no purpose in that regard. The age of the telegram, and the extent of prior public disclosure concerning it, and concerning operation SHAMROCK are particularly significant. Secondly, this Court believes that *in camera* proceedings by Judges should be conducted with great caution and only when some demonstrated necessity exists. Our adversary process relies on open argument, confrontation and cross-examination to asssure that the evidence presented is trustworthy. These elements are sacrificed when a party is removed or excluded from the proceedings in his own case. *Klaus v. Blake*, 428 F.Supp. 37 (D.D.C. 1976). On our scale of national values, the *appearance* of doing Justice between parties ranks only slightly below the doing of Justice itself. Our sensitivity is increased when the federal government, or sovereign, of which we ourselves are usually perceived to be a constituent part, is one of the disputants. If a court will flip-flop in its adjudication of a right which Congress has created in favor of the citizens and against the Government, doing so on the basis of a Top Secret Paper, when all other evidence points so strongly the other way, what is the effect on our cherished ideals? And the paper concerns an assassination of a President, still shrouded in mystery and suppression of truth after sixteen years, as is the assassination of a prior President after one hundred fourteen years.

Our concerns here were expressed by the District Court for the District of Columbia as follows:

"Is it not alien to our entire jurisprudence that courts are to function *ex parte* in private without benefit of the adversary process? Will it not degrade the judiciary if it is used as a mechanism for resolving statutory rights on the basis of undisclosed representations made in chambers to judges by parties having a direct personal interest in the outcome? Surely our whole jurisprudence since the Magna Carta and the abolition of Star Chamber proceedings requires that the judiciary in both fact and appearance remain neutral, independent of Executive or legislative influence. The adversary system is a well-tested safeguard for preserving the integrity of the judicial process. It is the duty of a judge wherever possible to resolve rights of citizens upon facts and arguments that are presented in an adversary context exposed to public view with all the protections fair hearing and due process provide." *Military Audit Project v. Bush*, 418 F.Supp. 876 (D.D.C. 1976).

Accordingly, on reargument, the Court adheres to its prior determination and declines to review the specified Top Secret Affidavit *in camera*.

Settle a Judgment forthwith on five (5) days notice or on waiver of notice as directed by this Court's memorandum and order of April 3, 1980.

So ordered.