**Philip AGEE, Plaintiff,**

v.

**CENTRAL INTELLIGENCE AGENCY, Federal Bureau of Investigation, National Security Agency, Department of State, Department of Justice, Defendants.**

Civ. A. No. 79–2788.

United States District Court,
District of Columbia.

July 17, 1981.

Melvin L. Wulf, Clark, Wulf, Levine & Peratis, New York City, William H. Schapp, ACLU Foundation, Washington, D. C., for Agee.

John B. Maclay, Kirk I. Victor, Attys., Civil Division, Dept. of Justice, Washington, D. C., for CIA.

## MEMORANDUM

GESELL, District Judge.

This Memorandum resolves the Central Intelligence Agency (CIA) aspect of this Freedom of Information Act suit which involves several sensitive agencies.[1]

Agee, a former CIA official residing in Germany, requested through his attorney access to and copies of all files and records in the possession of the CIA pertaining to, referring to, or in any way related to himself. This request has necessitated expensive and time-consuming documentary retrieval and analysis by numerous CIA personnel. The CIA has located approximately 8,699 CIA documents responsive to Agee's request. The Agency has refused to release 8,175 documents in their entirety, and released most of the remainder only in part, claiming exemption under sections (b)(1), (b)(3), (b)(5) and (b)(6) of the Freedom of Information Act, 5 U.S.C. § 552 (1976).

The CIA submitted public and *in camera* affidavits to support its claim of exemption. Motions were then filed by both sides and issues were briefed. In addition, the Court has conducted a random *in camera* review of the documents. This review, which occurred mainly at CIA headquarters because of the volume and sensitivity of the material, was designed to inspect examples of documents in all categories, to explore special situations reflected in the public filing, and to test the practicability of further indexing, the possibility of segregation and, of course, the validity of the method and standards used by the Agency in designating material for exemption. The matter is now ripe for decision.

Agee's request, in effect, sought the entire record of his employment, including covers arranged and missions assigned, and, more significantly, full documentation of an extensive, on-going counterintelligence effort which the CIA mounted against Agee following his resignation. The CIA began this investigation because of clear indications that Agee had embarked on a deliberate program to disparage the Agency by revealing sensitive information and compromising agents still active in the field, all in breach of his employment contract. No purpose would be served by elaborating on the details of Agee's post-resignation conduct because no basis exists under FOIA for differentiating between applicants on the basis of their character or motives.[2] *See Moorefield v. United States Secret Service,* 611 F.2d 1021 (5th Cir. 1980).

Understandably, the Agency has sought to protect its sources of information, its counterintelligence methods and specific information relating to its day-to-day efforts to thwart Agee's persistent campaign directed against it. In opposing disclosure the Agency relies primarily on exemption (b)(1), which covers material classified pursuant to an Executive Order (in this case Executive Order 12065, 43 Fed.Reg. 28,949 (1978)) and on exemption (b)(3), which exempts information barred from disclosure by other statutes (in this case the National Security Act of 1947, 50 U.S.C. § 403(d)(3) (1976), and the Central Intelligence Act of 1949, 50 U.S.C. § 403g (1976)). A few documents are also claimed to be exempt either in whole or in part under (b)(5) or (b)(6).

1. In his complaint filed October 17, 1979, Agee also sought documents from the National Security Agency, the FBI, the Department of Justice, and the Department of State. The Court has monitored the processing of Agee's requests of the various defendant agencies in an effort to assure prompt compliance and to resolve claims of exemption as they become ripe. Delay has been caused by the volume and nature of the material sought, the need of agencies to deal with numerous other FOIA demands, and difficulties of scheduling caused by Agee's residence abroad and other commitments of his counsel. This Memorandum does not deal with Agee documents in CIA files that originated with other agencies. This small group of 259 documents will be covered separately. They involve State, Justice, FBI, Secret Service, IRS, Drug Enforcement, Defense Intelligence Agency, and Air Force.

2. Agee's activities are described in his own books, including Inside the Company: CIA Diary (1975); Dirty Work: The CIA in Western Europe (1978) (edited with L. Wolf); Dirty Work II: The CIA in Africa (1979) (edited with others). *See also Haig v. Agee,* —— U.S. ——, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); *Agee v. Central Intelligence Agency,* 500 F.Supp. 506 (D.D.C.1980).

As stated, the Agency claims protection for most of the documents in their entirety and for portions of most of the remainder. Of the documents withheld either in whole or in part, 8,127 are classified and are claimed to be protected by (b)(1); 8,324 concern intelligence sources and methods and are claimed to be protected by (b)(3) under the secrecy statutes; 244 are claimed for exemption under (b)(5); and 263 are claimed to be exempt under (b)(6). Material withheld is usually claimed to be protected by more than one of the four exemptions.

### Vaughn v. Rosen Index

■ As a threshold matter, Agee challenges the sufficiency of the index supplied by the CIA. Rather than prepare a traditional index as outlined in *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), the Agency has provided public affidavits indicating why the papers withheld are believed to be protected under the exemptions claimed. In addition, as to each document withheld in whole or in part an index is furnished listing one or more of the following categories that are deemed to apply to each individual document:

A. Name or other personal identifier of an intelligence source, exemptions (b)(1) and (b)(3).

B. Circumstantial information which, in combination with other information, could lead to the identification of an intelligence source, exemptions (b)(1) and (b)(3).

C. Information acquired as a consequence of a liaison arrangement with a foreign intelligence or security service with an understanding that the information is to be kept in confidence, exemptions (b)(1) and (b)(3).

D. Information revealing the existence of a liaison arrangement with a foreign intelligence or security service which includes an understanding that the existence of the liaison arrangement is to be kept in confidence, exemptions (b)(1) and (b)(3).

E. Information confirming the existence of a CIA station in an identified location abroad, exemptions (b)(1) and (b)(3).

F. Information identifying a CIA staff employee, exemption (b)(3).

G. Information identifying a CIA organizational component, exemption (b)(3).

H. A pseudonym or a cryptonym, exemptions (b)(1) and (b)(3).

I. Filing instructions and information processing, storage and retrieval markings, exemption (b)(3).

J. Information which is currently and properly classified, (e. g., foreign policy related, but not sources and methods), exemption (b)(1).

K. Information which is subject to congressional privilege, exemption (b)(5).

L. Information which, if released, would constitute a clearly unwarranted invasion of personal privacy, exemption (b)(6).

M. Classification and information control markings.

N. Information disclosing an intelligence method used in intelligence analytical activities or collection operations, exemptions (b)(1) and (b)(3).

O. Privileged information within the context of an attorney-client relationship, exemption (b)(5).

Each category is fully explained in the public affidavit of Mr. McMahon. Most documents are claimed to be exempt under several categories.

Agee seeks a more definitive index, urging that this generic index fails to satisfy the requirements of *Vaughn v. Rosen*. The Agency resists primarily on the ground that an index which disclosed dates, types of document and location of origin from which sent, as suggested by Agee, would compromise intelligence sources and other protected information. On the other hand, the Agency argues that a non-generic index containing less specific information than that sought would be meaningless as far as

providing any basis for resolving the issues tendered on the motion for summary judgment.

The contested documents mainly fall into several broad groupings: (1) post-resignation documents relating to active counterintelligence; (2) pre-resignation counterintelligence documents; (3) congressional exchanges; and (4) legal department papers.

The bulk of the documents relate to the CIA's on-going counterintelligence investigation of Agee's activities. The protection sought for these documents, almost all of which are classified, derives from an obvious need to protect identifiable danger to national security. The Court's random *in camera* review demonstrated the utter futility of requiring a more detailed index of this material. It must be borne in mind that this request involves not a few scattered documents but rather a mass of consecutive documentation. As the Agency vigorously asserts, disclosure of dates, subject matter and point of origin would allow Agee to match his own activities and knowledge against the information supplied and draw reasonable inferences as to the identity of sources and intelligence methods being employed. On the other hand, the Court, let alone Agee, would not benefit from a non-generic index of those documents that was more cryptic. The Court is far better informed by its random review, coupled with the generous but unfocused detail found in the public and *in camera* affidavits.

In *Vaughn v. Rosen, supra* at 826–27, the Court expressly disclaimed an indexing requirement that would breach the very protection that the exemptions were intended to afford. This consideration is obviously of utmost consequence where, as here, the request seeks to intrude into an on-going counterintelligence effort arising out of urgent threats to national security.

Three other groups of documents need to be considered in terms of the lack of detailed indexing. The first and largest is the group of pre-resignation documents. Here again, further indexing is inappropriate. Many of these documents have been turned over to Agee with deletions. This portion is self-explanatory since each deletion on a page is keyed to one of the specific deletion factors listed above. In this group, 102 documents have been withheld in their entirety, except for dates, under (b)(1) because of national security implications. *In camera* review of a sample of these papers showed that further indexing would be either meaningless or so revealing as to frustrate the (b)(1) exemption claimed.

A small group of 30 documents relates to communications from or to congressional entities. This group includes five unclassified communications from individual congressmen requesting information and will be discussed in more detail later. The remainder of this group originated from the CIA, and is claimed to be protected under (b)(1) or (b)(3). Indexing of these latter materials would be subject to the same difficulties described for the classified documents.

Finally, there are nine documents from the General Counsel's office claimed to be exempt under (b)(5) on the ground that they involve communications incident to formulation of policy. As to these, the generic indexing is clearly sufficient for the Court's purposes, aided by *in camera* review.

In summary, the Court holds that no further indexing will be required. Any type of more specific index that would be meaningful to Agee or the Court would breach the very exemptions claimed. Under the exceptional circumstances of this case an exception to the *Vaughn v. Rosen* requirement is mandated to sustain the congressional intent in enacting FOIA.

### Segregation

█ Agee also contends that there has been a failure to segregate and release portions of (b)(1) and (b)(3) documents withheld in their entirety which are not entitled to protection under these exemptions. *See Mead Data Central, Inc. v. United States Dept. of Air·Force*, 566 F.2d 242, 256–262 (D.C.Cir.1977). Here again, the *in camera*

review has served to assure the Court that these suspicions and concerns are unfounded. CIA staff carefully reviewed each document, deleting only material that fell into one or more of the categories in the deletion list previously noted. Material falling outside these deletions which proved substantive and understandable was released. Individual sentences were, of course, not bifurcated, nor was unintelligible information that remained after deletion furnished if deletion destroyed the meaning of the remainder. Since most of the documents are one page or less, and often in cable form, the opportunity for segregation which exists in long, rambling historical-type documents was rarely present.[3] The Court's random inspection found no documents where segregation was required or indeed feasible.

Agee's argument that additional information should be segregated is based primarily on the fact that a large number of documents have been withheld in their entirety and on the belief that nonsecurity information must be interspersed in these materials which should be released. It is not disputed that occasionally information excerpted from a single document may appear innocuous and unrevealing. The difficulty is that this type information, when read together with similar information in related documents, discloses a pattern and becomes increasingly suggestive, particularly to Agee, of a source or method that should be protected. Specific instances illustrating how readily identity of sources, for example, may be compromised by release of data not itself sensitive were noted by the Court during its *in camera* inspection.

### Alleged Agency Misconduct

■ Agee emphasizes that he seeks identification of post-resignation documents that he believes will reveal conduct of the Agency in violation of his First and Fourth Amendment rights. Whether or not in the totality of the circumstances it could be said that some kind of illegality may have oc-

curred cannot be resolved by the Court in the exercise of its FOIA responsibilities, particularly where both the law and the facts are undetermined. In any event, the possibility that withheld documents might suggest some marginal activity by an agency does not automatically detract from a valid exemption. *See Lesar v. United States Dept. of Justice*, 636 F.2d 472, 483 (D.C.Cir.1980). As far as this case is concerned, the Court is entirely satisfied from its random inspection of the materials themselves that no exemption is being claimed as a pretext to conceal misconduct.

### The Merits

■ It remains for the Court to analyze the presentation made to ascertain whether or not the Agency has met the requisite statutory standards for the exemptions claimed. To this end the Court must consider among other things whether or not (1) the classified documents have been properly reappraised and reclassified under the Executive Order, (2) the claim of exemption is supported and made in a reasonable, conscientious manner with full good faith, and (3) the law has been properly applied to the materials in issue. *See, e. g., Phillippi v. CIA*, No. 80–1940 (D.C.Cir., June 25, 1981); *Military Audit Project v. Casey*, No. 80–1110 (D.C.Cir., May 4, 1981); *Sims v. CIA*, 642 F.2d 562 (D.C.Cir.1980); *Lesar v. United States Dept. of Justice*, 636 F.2d 472 (D.C.Cir.1980); *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854 (D.C. Cir.1980). The adequacy of the search is not contested.

There is no basis for questioning the classification decisions reached in this case. The correct reclassification procedures were followed by an authorized classification officer according to the provisions of Executive Order 12065 as outlined in detail in the McMahon affidavit. Each document was reviewed by authorized personnel, reappraised and clearly stamped to indicate the current level of classification. Working papers with the documents demonstrate that

---

**3.** Document No. 07968, a lengthy document, was carefully segregated and is cited as an example of how the Agency's deletion procedure was faithfully carried out.

the process was meticulous and specific as to each sheet of paper.

The Executive Order authorizes the classification of information when disclosure could reasonably be expected to damage the national security. The classification decisions made by the Agency and the reasons advanced in support of those decisions appear entirely reasonable in light of that standard. Much of the material was classified to protect vital and often fragile intelligence sources in most instances still available and used.[4] Beyond this many of the documents comprise an active counterintelligence file replete with information about Agency activities which, if revealed, would compromise a large number of personnel as well as the underlying apparatus vital to the nation's intelligence effort.

It is not the function of the Court to go beyond this and second-guess the trained concerns of experienced intelligence officials. *Halperin v. NSC,* 452 F.Supp. 47, 51 (D.D.C.1978), aff'd, 612 F.2d 586 (D.C.Cir. 1980). It is their judgment and their judgment alone that in the last analysis must control as to the merits of classification so long as there is no indication of a lack of good faith or pretext. The Court is satisfied that the agency has proceeded conscientiously, carefully and without pretext or bad faith.

Approximately 8,324 documents are claimed to be exempt under (b)(3). This material shows, among other things,

A.  How CIA decided which Agency assets, employees, sources and organization might be vulnerable to a possible exposure by plaintiff in light of his expressed intention to expose CIA activities.

B.  What factors CIA considered important in determining action to take to reduce or negate the damage of the vulnerable assets.

C.  What actions the Agency took in an attempt to measure the real intent of plaintiff in light of his expressed intentions to expose CIA activities.

D.  What actions the Agency took to protect Agency assets after the publication of plaintiff's book.

E.  How the Agency tested for the possible presence of hostile foreign intelligence services behind activities of the plaintiff that appeared aggressively hostile and threatening to United States national security interests; and with what success.

F.  How CIA used intelligence sources knowledgeable of the inner-workings of various hostile foreign intelligence services to find evidence of their involvement in or support of plaintiff's activities; and with what success.

G.  How CIA employed its counterintelligence assets in various foreign countries in response to the counterintelligence threat plaintiff posed; and with what success.

H.  How policy and legal considerations may limit CIA's operational choices under certain circumstances.

This claim is based on the statutory protection afforded by the National Security Act of 1947, 50 U.S.C. § 403(d)(3) (1976), and the Central Intelligence Act of 1949, 50 U.S.C. § 403g (1976). These statutes must be given full recognition under (b)(3) and that exemption is obviously applicable where claimed. It is significant that of the 8,324 (b)(3) documents, 8,127 are classified and thus also claimed to be exempt under (b)(1). The Court's random review included inspection of some (b)(3) documents not also covered by (b)(1). The Court was satisfied that the material inspected fell within one or both statutes.

Samples of some 244 documents claimed to be exempt in whole or in part under (b)(5) were examined. These indicated that the exemption was applied strictly to intra- or inter-agency material relating to policy formulation. For example, one group consists of documents from the Agency's legal

---

4.  It is significant that 81 percent of the post-resignation documents withheld are also with-

held to protect agency sources under (b)(3).

department concerning possible courses of action to be considered in respect to Agee matters. These materials are obviously the type of intra-agency communications protected by (b)(5). A few of the responsive documents relate to communications between various congressional entities and the CIA. Of this group, documents originating with the CIA are protected independently under (b)(1) or (b)(3); therefore, the Court need not consider whether these documents are also protected by (b)(5). With respect to the five documents in this group originating from Congress, exemption (b)(5) does not apply since Congress is not an agency within the terms of the statute. The Court holds that these few congressional letters must be disclosed to Agee. The Agency's desire to honor the confidentiality of routine communications from congressmen is understandable, but the Act affords no protection in the circumstances of this case. *See Holy Spirit Assn. v. CIA,* 636 F.2d 838 (D.C.Cir.1980); *Goland v. CIA,* 607 F.2d 339 (D.C.Cir.1979) (per curiam), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

Of the 263 documents claimed to be exempt under (b)(6), only one document was withheld in its entirety based solely on this exemption. The Court's *in camera* review of this document reveals that protection is appropriate because this communication came unsolicited from a member of the public and reflects adversely on the writer. Disclosure would constitute a clearly unwarranted invasion of that person's privacy. As to portions of additional documents withheld solely based on (b)(6), the Court's random *in camera* review of these documents reveals that the information withheld was limited to information about persons other than the plaintiff and his family likely to cause them harm or discomfort if made public. The protection claimed for these documents is entirely appropriate and narrowly claimed. In all other cases involving (b)(6), the documents withheld were claimed to be protected primarily by (b)(1), (b)(3) or (b)(5) in any event.

Thus the Court concludes that

(1) The public affidavits contain the requisite reasonable specificity of detail and are not merely conclusory. *In camera* filings and the Court's *in camera* review confirm the genuineness of the representations made and the inappropriateness of providing more information by public index. *See NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978); *Church of Scientology v. Turner,* No. 80–1172 (D.C.Cir., December 18, 1980); *cf. Vaughn v. Rosen,* 484 F.2d 820, 826–27 (D.C.Cir.1973).

(2) Documents withheld in their entirety cannot be segregated since unprotected material is inexorably intertwined with that which must be protected and segregation would be ineffective. *See Mead Data Central, Inc. v. United States Dept. of Air Force,* 566 F.2d 242 (D.C.Cir.1977).

(3) The proper reclassification procedures have been followed. The predicted, clearly identified dangers to national security are reasonably anticipated and classification is appropriate where claimed.

(4) The National Security Act of 1947, 50 U.S.C. § 403(d) (1976), and Central Intelligence Act of 1949, 50 U.S.C. § 403g (1976), justify all claims for exemption under (b)(3). *See Goland v. CIA,* 607 F.2d 339, 351 (D.C.Cir.1978); *Weissman v. CIA,* 565 F.2d 692, 694 (D.C.Cir.1977).

(5) Material received by the CIA from congressmen is not protected under (b)(5). The Court holds that these five congressional letters must be disclosed to Agee.

(6) All claims to exemption under (b)(6) are sustained because disclosure of these documents would constitute a clearly unwarranted invasion of personal privacy.

As far as can be determined this is the first FOIA case where an individual under well-founded suspicion of conduct detrimental to the security of the United States has invoked FOIA to ascertain the direction and effectiveness of his Government's legitimate efforts to ascertain and counteract his effort to subvert the country's foreign intelligence program. It is amazing that a rational society tolerates the expense, the

waste of resources, the potential injury to its own security which this process necessarily entails.[5] Nonetheless, the Court, conscious of its responsibility to apply the Act as presently written and interpreted, has diligently sought to assure itself that under the exacting standards laid down the CIA has complied in good faith with Agee's extraordinary request. That determination has now been affirmatively made and an order carrying out the statute in accordance with this Memorandum is filed herewith. The motion of the CIA for partial summary judgment is granted except as to the five documents in the CIA files which represent communications from congressmen concerning Agee.

SO ORDERED.

---

5. As of January, 1981, the Directorate of Operations of the CIA, where 92 percent of the documents were retrieved, had expended approximately 25,000 man hours on the request involving salaries totalling $327,715 and computer costs of $74,750. The costs now far exceed this sum. Under the statute these costs cannot be charged to Agee in whole or in part.